NOTICE

Decision filed 11/30/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200045

NO. 5-20-0045

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-1379 |
| | ) | |
| PATRICIA A. SCHANTZ, | ) | Honorable |
| | ) | Zina R. Cruse, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court, with opinion.
Justices Welch and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    On October 20, 2016, the State charged the defendant with one count of aggravated driving under the influence involving a death (625 ILCS 5/11-501(a)(2), (d)(1)(C) (West 2014)) and one count of reckless homicide with a motor vehicle (720 ILCS 5/9-3(a) (West 2014)). The charges stemmed from an accident that occurred on April 1, 2016, involving a fatality.

¶ 2    The defendant filed a motion to suppress the results of two blood draws taken at different times on the morning of the accident, arguing that they violated the fourth amendment guarantee against illegal searches and seizures as applied to the states through the fourteenth amendment. U.S. Const., amends. IV, XIV. The trial court denied the motion to suppress after a hearing.

¶ 3    Following a September 3, 2019, stipulated bench trial, the defendant was found guilty of both charges. She was subsequently sentenced to a term of six years of imprisonment, to be served

1

at 85%, followed by a two-year period of mandatory supervised release. The defendant filed a motion to reconsider her sentence, which the court denied. The defendant now appeals the trial court's denial of her motion to suppress evidence, arguing that the admission of the evidence violated her fourth amendment constitutional rights. U.S. Const., amend. IV. For the reasons stated in this opinion, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5     The factual background that follows in this opinion is derived from the record on appeal. Much of it comes from the testimony and arguments presented during the hearing on the motion to suppress and from the stipulation of facts and evidence filed with the court on behalf of the State and the defendant on September 3, 2019.

¶ 6     On April 1, 2016, at approximately 6:03 a.m., the defendant was driving her vehicle eastbound on Route 161 in St. Clair County. At that time, sunrise had not yet occurred, and the area remained dark. The weather was clear with no rain, snow, or fog. The defendant failed to yield to an oncoming motorcycle when she began turning north onto Shiloh Station Road. The motorcycle struck the defendant's front passenger door. Douglas Landers was the motorcycle driver.

¶ 7     Illinois State Police responded to the scene of the accident. Upon arrival, Illinois State Police trooper Darrell Scruggs found Landers's body 10 to 15 feet from the motorcycle, lying face-down on the road. Trooper Scruggs immediately exited his vehicle and approached the body. He checked for a pulse and found none. A short time later, emergency medical services arrived. Landers was taken by ambulance to an area hospital but was pronounced dead.

¶ 8     Trooper Darrell Scruggs and Sergeant Devin Watts were called to testify at the hearing on the defendant's motion to suppress. Trooper Scruggs testified that when he arrived, the defendant's

2

vehicle was parked on the right side of Shiloh Station Road. The defendant was inside the vehicle. Trooper Scruggs approached the defendant's vehicle to identify himself. He testified that the defendant's demeanor was "[r]eal shaky and nervous," and she was crying. She was also smoking a cigarette. During this initial interaction with the defendant, he did not smell alcohol. He stated that the only thing he smelled "was the actual cigarette, itself." After Trooper Scruggs returned to his squad car to begin his accident report, however, Sergeant Watts informed him that in his initial contact with the defendant, he detected a strong odor of alcohol. The defendant had no notable injuries and declined medical attention. At the scene, Sergeant Watts told the defendant that he smelled alcohol and believed that she had been drinking. The defendant advised him that she had consumed "a few" drinks and had slept for a few hours at a friend's house in the Shiloh/Belleville area "to make sure she was okay to be driving."

¶ 9      Trooper Scruggs determined that because of the nature of the accident and the strong smell of alcohol, the defendant needed to undergo field sobriety tests. The defendant failed to properly perform these tests. The officers found that her speech was "thick-tongued," "slow," and "drawn out." Further, the officers noted that her eyes were "glossy and a little bloodshot" and were noted to be "heavy and slow in response to movement." The defendant informed the officers that she saw no traffic before she made the fatal turn onto Shiloh Station Road. She stated that she felt an impact, but she did not know what she hit. The defendant submitted to a portable breath alcohol test at the officers' request. The test registered a blood alcohol concentration (BAC) of 0.16. Trooper Scruggs placed the defendant under arrest for driving under the influence (DUI). He informed the defendant that he was going to transport her to Belleville Memorial Hospital to obtain samples of her blood and urine because Illinois State Police protocol requires a blood test if there

3

is a possible fatality. Trooper Scruggs testified that on April 1, 2016, he believed that the Illinois law on forcible blood draws was valid.

¶ 10    The parties entered a stipulation of facts and evidence that included details about the defendant's field sobriety tests. The defendant asked Trooper Scruggs if she had to do the sobriety tests. He advised her that she could refuse to do the tests, but that law enforcement would obtain a blood sample. The defendant agreed to do the tests. The field sobriety tests were captured by a dashcam video. Before the walk-and-turn test and the one-leg-stand test, Trooper Scruggs confirmed that the defendant understood his instructions. In addition, he demonstrated how each test needed to be performed. The defendant removed her boots for these two tests. During the walk-and-turn test, the defendant was required to walk heel-to-toe for nine steps along a straight line. The defendant failed to walk heel-to-toe and stepped off the line. During the one-leg-stand test, the defendant was required to raise one foot and remain standing for 30 seconds within three attempts. The defendant raised her right foot only to place the foot down 4 seconds later, then raised her right foot again, but placed the foot down within several seconds. Finally, she raised her foot a third time and placed it down after 17 seconds. With the horizontal gaze nystagmus test, Trooper Scruggs noticed that there was a lack of smooth pursuit in both eyes, distinct and continuous nystagmus at maximum deviation in both eyes, and the onset of nystagmus prior to 45 degrees in both eyes. While performing this test, Trooper Scruggs continued to smell the strong odor of alcohol on the defendant's breath. The defendant failed all field sobriety tests.

¶ 11    Upon arrival at Belleville Memorial Hospital, Trooper Scruggs advised "a couple nurses" that he needed a blood sample from the defendant. Trooper Scruggs testified that he realized he left his paperwork in his vehicle and instructed the nurses to wait until he returned with the paperwork. That paperwork included a copy of the "Warning to Motorist," a form containing

explanations of the *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), and a traffic crash report. Despite his request to hospital staff, when he returned to the defendant's room, a blood draw was already in progress.

¶ 12     The defendant testified that she neither consented nor objected to the hospital's blood draw. She testified that a nurse came into the room and informed her that she was there to take a blood sample. The nurse drew the blood and then left the room. Similarly, the nurse asked and obtained a urine sample from the defendant.

¶ 13     The hospital provided Trooper Scruggs with the blood and urine samples collected by its staff member, Mary Carter, at 7:50 a.m. Thereafter, Scruggs took the samples to the Illinois State Police District 11 headquarters and signed the blood and urine samples over to evidence custodian, Robert Meilink. Meilink logged the samples into evidence. Meilink then delivered the blood and urine samples to Lora Furlong, an evidence technician employed by the Illinois State Police Springfield Forensic Science Laboratory. On April 5, 2016, Furlong subdivided the April 1, 2016, 7:50 a.m. blood and urine samples into two tubes of blood (Exhibit 1A) and two tubes of urine (Exhibit 1B). Dareea Patrick Paiva, a toxicologist employed by the Illinois State Police Springfield Forensic Science Laboratory, tested the blood and urine samples (Exhibits 1A and 1B) on April 20, 2016. Using headspace gas chromatography, Paiva determined that the blood sample (Exhibit 1A) contained 0.156 g/dL ethanol. She detected no drugs in the urine sample (Exhibit 1B).

¶ 14     Following the 7:50 a.m. blood and urine collections from the defendant, at 8:13 a.m., Trooper Scruggs read the defendant the "Warning to Motorist" and her *Miranda* rights, both from preprinted forms. After having an opportunity to read the forms, the defendant signed them. After reading the warnings to the defendant, Scruggs asked her to voluntarily submit to a second blood

5

draw. Trooper Scruggs testified that although he made this request, he did not obtain the sample at that time. Based on this testimony, we deduce that the defendant apparently declined.

¶ 15    Trooper Scruggs testified that he issued three uniform tickets for the defendant, charging her with operating an uninsured motor vehicle (625 ILCS 5/3-707 (West 2014)), failure to yield when turning left (*id.* § 11-902), and driving under the influence of alcohol (*id.* § 11-501(a)(2)). The defendant was informed of the three tickets, but Trooper Scruggs testified that she was not provided with copies. He testified that in cases involving pending investigations into more serious potential charges, police do not issue tickets at the time of the accident. When asked why, he explained that if the defendant had been provided with the tickets on April 1, 2016, she could have pled guilty to those three charges before the investigation was complete. We note that the constitutional doctrine of double jeopardy would then preclude the State from filing more serious charges against the defendant involving the fatality.

¶ 16    During the hearing on the defendant's motion to suppress, Trooper Scruggs testified that on the morning of April 1, 2016, he informed Illinois State Police special agent Bryant Johnson that although he instructed the Memorial Hospital nursing staff to wait before taking samples from the defendant, they had done so before he had the opportunity to read the defendant her *Miranda* warnings and the "Warning to Motorist" from the preprinted forms. He explained that "it was improper" for him not to "read that information" to the defendant before her blood was drawn. Asked by defense counsel if he acknowledged that he "didn't follow the letter of the law to a T," Trooper Scruggs replied, "No, I did not, because I informed the nurses not to perform anything until I got back with my paperwork."

¶ 17    The stipulation of facts indicated that Special Agent Johnson responded to Belleville Memorial Hospital after he acquired a search warrant for the defendant's blood, urine, breath, or

other bodily substances. Special Agent Johnson contacted the St. Clair County State's Attorney's Office to speak to the warrant officer. The warrant officer on that date was attorney Erin Conner. Conner recommended that a search warrant request be drafted to seek the court's approval to collect the defendant's bodily fluids for testing. St. Clair County Judge Vincent J. Lopinot found that probable cause existed for the requested search warrant and issued the warrant at 11 a.m. on April 1, 2016.

¶ 18     Special Agent Johnson arrived at Belleville Memorial Hospital with the search warrant at 11:36 a.m. He testified that he believed he was the individual who served the defendant and the hospital with the search warrant. At 11:55 a.m., Michael Ahart, a registered nurse, collected blood and urine samples from the defendant, and immediately handed the samples over to Special Agent Johnson.

¶ 19     During the defendant's testimony at the motion to suppress hearing, she stated that the second collection was different from the first because, this time, hospital personnel brought in "a box." She testified, however, that she saw no warrant, and no one provided her with any warnings before they obtained her blood and urine samples. The defendant acknowledged signing forms presented to her while at the hospital, but she testified that she did not read them.

¶ 20     Upon departing from Belleville Memorial Hospital, Special Agent Johnson transported the samples to the Illinois State Police District 11 headquarters and handed the samples to evidence custodian Brian Clay. Clay then logged the samples into evidence. Meilink then delivered the blood and urine samples to evidence technician Furlong at the Illinois State Police Springfield Forensic Science Laboratory.

¶ 21     On April 5, 2016, Furlong subdivided the April 1, 2016, 11:55 a.m. blood and urine samples into two tubes of blood (Exhibit 2A) and two tubes of urine (Exhibit 2B). Illinois State

Police toxicologist Paiva tested the April 1, 2016, 11:55 a.m. blood and urine samples (Exhibits 2A and 2B) on April 20, 2016. Using headspace gas chromatography, Paiva determined that the blood sample (Exhibit 2A) contained 0.078 g/dL ethanol but stated that the estimated uncertainty of the results is +/- 2.33% at the 95% confidence interval, which would result in an ethanol range of 0.076 to 0.080 g/dL. She detected no drugs in the urine sample (Exhibit 2B).

¶ 22    Dr. Chris Long, an expert witness in the field of toxicology, indicated he would testify that using police reports and Paiva's toxicology report and using a procedure known as retrograde extrapolation, he concluded that the defendant's BAC at 6:03 a.m. was 0.188 g/dL. He also would testify that a blood alcohol level of 0.188 g/dL would result in significant impairment of the nervous system, including vision, cognition, reaction times, attention, muscular coordination, judgment, and the ability to perform complex tasks, like operating a motor vehicle. Dr. Long also reviewed the toxicology report on the decedent, Douglas Landers, and determined that there was no active cocaine or cannabinoids in his system. He concluded that he could attribute no impairment to Landers.

¶ 23    On December 13, 2018, the defendant filed a motion to suppress evidence of both blood draws. She argued that the first sample was not collected in compliance with statutory law and procedure and was, therefore, in violation of her fourth amendment rights. U.S. Const., amend. IV. Although she acknowledged that the second blood draw was obtained pursuant to a search warrant, she asserted that she was not provided with a copy of the "Warning to Motorist," a sworn law enforcement report, any traffic citations, or a notice to appear. She further alleged that she was not notified of any violations until the State filed charges in this case on October 20, 2016, more than six months after the accident.

8

¶ 24   The hearing on the defendant's motion to suppress was held on April 17, 2019, and July 30, 2019. The State argued that the failure to read the "Warning to Motorist" prior to obtaining the blood samples did not have fourth amendment implications. While the failure to read the warning could provide grounds to rescind a statutory summary suspension of the defendant's driver's license, a civil process, that same failure would not bar a criminal prosecution for DUI. In response to the defendant's fourth amendment argument, the State argued that the defendant had provided implied consent. In Illinois, any person who drives a motor vehicle upon the public highways shall be deemed to have given consent to alcohol testing if arrested for DUI, as the defendant was in this case. See 625 ILCS 5/11-501.1(a) (West 2014). Thus, the State contended, the first blood draw complied with the fourth amendment. Alternatively, the State argued that the good faith exception to the exclusionary rule applies, and therefore the test results were admissible.

¶ 25   The defendant also argued that the second blood draw was constitutionally invalid because it "was not voluntarily given *** with full knowledge and information." Counsel explained, "A person has a right to refuse once they are informed of the consequences through the reading [of] the Warning to Motorist." In response, the State argued that the second blood draw was obtained pursuant to a court-ordered and validly executed search warrant. The State further argued that there was no evidence that the search warrant had been executed illegally and no evidence that the judge who authorized the search warrant had been misled in some manner or had been biased against this defendant. Moreover, the State argued that the defendant signed the consent forms prior to the second blood draw; therefore, the search was conducted, and the blood draw was obtained, pursuant to a valid exception to the warrant requirement.

¶ 26   The trial court took the matter under advisement. At an August 28, 2019, hearing on all remaining pretrial motions, the court denied the defendant's motion to suppress on the record.

¶ 27    On September 3, 2019, the trial court held a stipulated bench trial. We have already discussed the facts contained in the parties' factual stipulations, which were presented at the trial. At the conclusion of the trial, the trial court entered an order finding the defendant guilty of counts I (aggravated DUI involving a death) and II (reckless homicide with a motor vehicle). The court noted that, for sentencing purposes, count II would merge into count I and that, at sentencing, the court would be utilizing the sentencing range from count I. The court ordered a presentence investigation report and set the sentencing hearing for November 7, 2019.

¶ 28    On November 7, 2019, the trial court entered a written order *nunc pro tunc*, denying the defendant's motion to suppress. In it, the court found that neither blood draw violated Illinois statutory law or constitutional law, that neither blood draw involved misconduct by law enforcement, and that probable cause existed for the stop and subsequent charges filed against the defendant.

¶ 29    On that same day, the court held the sentencing hearing and sentenced the defendant to a term of six years of imprisonment, to be served at 85%, to be followed by a two-year period of mandatory supervised release. The defendant filed a motion to reconsider her sentence on November 25, 2019, which the court denied after a hearing on January 17, 2020. On February 7, 2020, the defendant timely filed her notice of appeal.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, the defendant argues that the trial court abused its discretion in denying her motion to suppress. She contends that both blood draws were unauthorized under the fourth amendment and therefore that they should have been suppressed. In response, the State argues that (1) both blood draws comported with the requirements of the fourth amendment; (2) even if they did not, the good faith exception to the exclusionary rule applies; and (3) even if we find that the

trial court erred in denying the motion to suppress, the error was harmless beyond a reasonable doubt in the face of the evidence. We agree with the State.

¶ 32    In proceedings on a motion to suppress, the defendant bears the initial burden of proof. He or she must demonstrate that a search occurred and that the search was unreasonable within the meaning of the fourth amendment. *People v. Pratt*, 2018 IL App (5th) 170427, ¶ 19. Once the defendant makes this *prima facie* showing, the burden shifts to the State to establish the constitutional validity of the search. *Id.* In reviewing a trial court's ruling on a motion to suppress, we employ a two-part standard of review. We review the trial court's findings of fact to determine whether they are against the manifest weight of the evidence. However, we review *de novo* the court's ultimate conclusion as to the admissibility of the evidence. *People v. Turner*, 2018 IL App (1st) 170204, ¶ 48.

¶ 33    The fourth amendment to the United States Constitution and a provision of the Illinois State Constitution guarantee the right to be free from "unreasonable searches and seizures." U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Compulsory testing of blood or other bodily fluids constitutes a search for purposes of the fourth amendment. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). The conduct of a private individual—such as the nurses who drew the defendant's blood in this case—has fourth amendment implications only if the private individual conducts the search while acting as an agent or instrument of the State under all the circumstances of the case. See *People v. Mueller*, 2021 IL App (2d) 190868, ¶ 41.

¶ 34    Here, there is no doubt that the nurses who drew the defendant's blood were acting as instruments of the State. The defendant did not seek or receive medical care at Belleville Memorial Hospital on the morning of the accident. Instead, the nurses drew her blood solely at the request

11

of Trooper Scruggs and Special Agent Johnson. The question, then, is whether the blood draws were "reasonable" within the meaning of the fourth amendment.

¶ 35    "To be reasonable under the fourth amendment, a search must ordinarily be conducted pursuant to a warrant supported by probable cause." *People v. Hayes*, 2018 IL App (5th) 140223, ¶ 27. With respect to the second blood draw, this standard was unquestionably met. As we stated earlier, a court issued a search warrant for the second blood draw. The warrant was issued based on Special Agent Johnson's assertions that the defendant exhibited signs of impairment while performing field sobriety tests and that the results of a portable breath test indicated her BAC was 0.160.[1] See *People v. Williams*, 2018 IL App (2d) 160683, ¶¶ 14-15 (explaining that probable cause to arrest a driver for DUI can be established by the officers' testimony that the defendant had slurred speech, red or glassy eyes, and the odor of alcohol coupled with evidence of impaired or erratic driving); *People v. Acevedo*, 2017 IL App (3d) 150750, ¶ 17 (explaining that "reasonable grounds" to believe a driver is under the influence for purposes of summary suspension proceedings is "synonymous with 'probable cause' " and finding evidence that the driver smelled of alcohol, acknowledged drinking a few beers, and failed field sobriety tests sufficient to meet this standard); 625 ILCS 5/11-501.5 (West 2014) (providing that the results of a portable breath test are admissible to establish probable cause).

¶ 36    The defendant does not even attempt to argue that the warrant was not supported by probable cause. Instead, she asserts that officers failed to comply with various requirements of the implied consent statutes, such as reading the defendant the "Warning to Motorist" prior to directing that her blood be drawn (see 625 ILCS 5/11-501.1(c), 11-501.6(c) (West 2014)) or providing her

---

[1]We note that the officers' observations of the defendant's bloodshot eyes, slow and "thick-tongued" speech, and the odor of alcohol were not included in the complaint for the warrant.

with notice of a sworn law enforcement report (see *id.* §§ 11-501.1(d), 11-501.6(d) (requiring officers to submit a sworn report to the Illinois Secretary of State immediately for purposes of statutory summary suspension and requiring the officer submitting the sworn report to also "serve immediate notice of this suspension" on the motorist)). The defendant does not explain how these asserted statutory violations somehow transformed a search conducted pursuant to a warrant, supported by probable cause, into a search that violated the fourth amendment. We find that the court properly ruled that the second blood draw was admissible.

¶ 37    The first blood draw, however, was not conducted pursuant to a warrant. Thus, we can only find that it comported with the requirements of the fourth amendment if it fell within a recognized exception to the requirement of a warrant. *Pratt*, 2018 IL App (5th) 170427, ¶ 18. One such recognized exception is the existence of exigent circumstances "that create a compelling need for officers to conduct the search before there is time to obtain a warrant." *Hayes*, 2018 IL App (5th) 140223, ¶ 27 (citing *McNeely*, 569 U.S. at 148-49). For this exception to apply, the search must also be supported by probable cause. *Id.* (citing *People v. Ferral*, 397 Ill. App. 3d 697, 706 (2009)). It was this exception that was at issue in *McNeely*. There, the United States Supreme Court noted that the natural dissipation of alcohol in the bloodstream "may support a finding of exigency in a specific case." *McNeely*, 569 U.S. at 156. However, the Court held that this does not create a *per se* exigency; rather, the existence of exigent circumstances that would justify a warrantless blood draw "must be determined case by case based on the totality of the circumstances." *Id.*

¶ 38    In the instant case, we do not believe the State can demonstrate the existence of exigent circumstances. Although there was some delay involved in securing the crime scene and ensuring that emergency medical responders attended to Landers, there was no reason at least one of the multiple officers involved in the investigation could not have applied for a warrant while the others

13

continued to investigate the accident, a factor this court has previously found pertinent. See *People v. Armer*, 2014 IL App (5th) 130342, ¶ 14. Moreover, neither Trooper Scruggs nor any other officer involved with the investigation testified that they believed the time needed to obtain a warrant would lead to the loss of crucial evidence. See *id.* It is also worth noting that once Special Agent Johnson applied for a warrant, it was issued quickly. As we will explain later in this decision, the evidence obtained pursuant to that warrant was more than adequate to support a DUI conviction. We thus find the exigent circumstances exception inapplicable to the circumstances of this case. As such, we must next consider whether another recognized exception to the requirement of a warrant applies.

¶ 39     Another exception is voluntary consent. *Pratt*, 2018 IL App (5th) 170427, ¶ 18. Here, the defendant testified that she neither consented nor objected to the testing of her blood. Because she did not give actual consent, we must turn our attention to Illinois's implied consent laws.

¶ 40     Three statutes are potentially applicable under the circumstances of this case—sections 11-501.1(a), 11-501.2(c)(2), and 11-501.6(a) of the Illinois Vehicle Code. See 625 ILCS 5/11-501.1(a), 11-501.2(c)(2), 11-501.6(a) (West 2014). Two of these statutes provide that motorists operating vehicles on the roads of this State give implied consent to drug and alcohol testing of their blood and urine under circumstances described in the statutes. Section 11-501.1(a) provides that drivers on Illinois roads are "deemed to have given consent" to such testing if they are arrested for DUI (see *id.* § 11-501.1(a)), while section 11-501.6(a) provides that drivers are "deemed to have given consent" if arrested for any non-equipment violation of the Vehicle Code when involved in an accident in which someone was injured or killed (*id.* § 11-501.6(a)). See also *Hayes*, 2018 IL App (5th) 140223, ¶ 44 (discussing both statutes). Although both statutes contain other requirements—for example, the requirement that officers read the "Warning to Motorist" (see 625

ILCS 5/11-501.1(c), 11-501.6(c) (West 2014))—the language describing *when* consent is deemed to be implied does not address these other requirements.

¶ 41    Here, Trooper Scruggs testified that he placed the defendant under arrest for DUI prior to transporting her to the hospital for the blood draws. Both he and the defendant testified that he told her she was under arrest for DUI before the tests were administered. Thus, under the express terms of section 11-501.1(a), the defendant was deemed to have consented to testing. In addition, because the accident involved a fatality, she was deemed to have given consent under section 11-506.1(a).

¶ 42    The consent implied by these two statutes is, generally, revocable. See *id.* § 11-501.1(b); *id.* § 11-501.6(b) (providing that "[a]ny person who is dead, unconscious[,] or who is otherwise in a condition rendering such person incapable of refusal shall be deemed not to have withdrawn the consent provided by subsection (a) of this Section"). A separate but related statute provides:

> "Notwithstanding any ability to refuse under this Code to submit to these tests or any ability to revoke the implied consent to these tests, if a law enforcement officer has probable cause to believe that a motor vehicle driven by *** a person under the influence of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof has caused the death or personal injury to another, the law enforcement officer shall request, and that person shall submit, *** to a chemical test or tests of his or her blood, breath or urine ***." *Id.* § 11-501.2(c)(2).

¶ 43    In *People v. Jones*, 214 Ill. 2d 187, 195-96 (2005), the Illinois Supreme Court upheld the validity of section 11-501.2(c)(2), reasoning that nonconsensual blood draws from DUI suspects were inherently reasonable under the fourth amendment because "the delay caused by obtaining a search warrant might have resulted in loss of evidence of the defendant's intoxication, given the natural dissipation of the alcohol in the defendant's blood." In the wake of the United States

15

Supreme Court's decision in *McNeely*, however, Illinois courts have had to reconsider the constitutional validity of our implied consent and compulsive drug and alcohol testing provisions. While many of the cases addressing the impact of *McNeely* have focused on section 11-501.2(c)(2), the Fourth District considered a challenge to the constitutionality of section 11-501.6 in *People v. Hasselbring*, 2014 IL App (4th) 131128. There, the defendant was involved in a motorcycle accident with another motorcycle. *Id.* ¶ 4. Following the accident, both drivers were transported to the hospital. *Id.* ¶ 6. The other driver sustained a serious head injury, which caused his death 45 days after the accident. *Id.* ¶¶ 6, 10. An investigating officer read the defendant the "Warning to Motorist" and asked him to provide blood and urine samples for testing. *Id.* ¶ 8. The officer acknowledged that he observed no signs of impairment. Instead, he requested the samples due to the severity of the other driver's injuries. *Id.* The samples tested positive for benzoylecgonine, a byproduct that remains in the body after cocaine has been metabolized. *Id.*

¶ 44 On appeal from his conviction after the denial of a motion to suppress the results of these tests, the defendant argued that section 11-501.6(a) was facially invalid under *McNeely*. *Id.* ¶ 39. In upholding the statute, the Fourth District emphasized that a statute "is only facially unconstitutional if it can never be constitutionally applied." *Id.* ¶ 42. The court found that the statute "does not create a *per se* exception" to the requirement of a warrant, explaining that a driver "can withdraw his consent and refuse the officer's request to provide a blood sample." (Emphasis omitted.) *Id.*

¶ 45 Thereafter, the First District held that section 11-501.2(c)(2) was unconstitutional on its face because "it permits compelled chemical testing without a warrant in all cases where an officer has probable cause to believe that a driver under the influence has caused death or personal injury to another." *People v. Eubanks*, 2017 IL App (1st) 142837, ¶ 66, *rev'd in part*, 2019 IL 123525.

16

In reaching this conclusion, the First District found *Hasselbring* distinguishable. The court emphasized that section 11-501.6, unlike section 11-501.2(c)(2), permits a driver to withdraw the implied consent to testing. *Id.* ¶ 64. The court noted that the defendant in *Hasselbring* chose to comply with the officer's request and explained that consent is a recognized exception to the requirement of a warrant. *Id.*

¶ 46    The Illinois Supreme Court reversed that ruling. *People v. Eubanks*, 2019 IL 123525, ¶ 100. However, it is important to emphasize that the supreme court overturned only the First District's conclusion that the statute was *facially* invalid. *Id.* ¶ 60. Instead, the supreme court went on to consider whether the statute was unconstitutional as applied in the case before it. *Id.* ¶ 61. In answering that question in the affirmative, the court examined the facts and circumstances of the case and found that there was no exigency to justify the warrantless tests. *Id.* ¶¶ 66-68. The court further suggested that the legislature "may wish to clarify" that the statute applies only in circumstances in which exigent circumstances are present. *Id.* ¶ 69. As we have already concluded, this case likewise does not involve exigent circumstances. Thus, under *Eubanks*, section 11-501.2(c)(2) is unconstitutional as applied in this case as well.

¶ 47    We note, however, that in *Eubanks*, the supreme court did not address the question of whether the application of sections 11-501.1 and 11-501.6 is subject to the same constitutional limitations as section 11-501.2(c)(2). In addition, this court has not squarely addressed the constitutionality of any of the implied consent provisions in the wake of *McNeely*. In *Pratt*, we declined to review the constitutional validity of any of the implied consent provisions, after finding them inapplicable to the facts of the case. *Pratt*, 2018 IL App (5th) 170427, ¶¶ 26, 29. In *Hayes*, we likewise did not address the validity of the statutes. There, we instead determined whether the

17

defendant's consent was implied under section 11-506.1(a). *Hayes*, 2018 IL App (5th) 140223, ¶¶ 42-57.

¶ 48    It is worth noting that in *Hayes*, section 11-501.2(c)(2) was not applicable because there was no dispute that the officer who requested the blood and urine samples did not have probable cause to believe the defendant was under the influence of drugs or alcohol. *Id.* ¶¶ 9, 30-31. Our analysis thus assumed two things: (1) section 11-501.6 was valid and (2) had we found that provision applicable, the consent to testing implied under the statute would have been sufficient to uphold the search independently of the requirements of section 11-501.2(c)(2).

¶ 49    After *Eubanks*, the validity of these assumptions is questionable. Although the First District found the revocability of the consent implied under section 11-501.6 to be a constitutionally significant distinction between that provision and the compulsory blood draws authorized by section 11-501.2(c)(2), the supreme court did not address this distinction. Moreover, without the "Warning to Motorist," a driver may not be aware of the right to refuse to submit to requested testing, thus rendering the ability to revoke the implied consent illusory. See *People v. Harris*, 2015 IL App (4th) 140696, ¶¶ 51-52 (explaining that the "Warning to Motorist" "informs a defendant of the various civil consequences attendant to a refusal to submit to testing" and that these "warnings clearly indicate a choice between consenting to testing and withdrawing consent to testing" before finding the defendant's implied consent to be voluntary). We need not resolve these questions here. It suffices to say that in light of existing precedent at the time of the accident, Trooper Scruggs reasonably could have believed that the defendant impliedly consented to the first blood draw under sections 11-501.1(a) and 11-501.6(a) and that, as such, the blood draw did not run afoul of the fourth amendment.

18

¶ 50      Ordinarily, evidence obtained in violation of the fourth amendment is subject to exclusion. *People v. Harrison*, 2016 IL App (5th) 150048, ¶ 15 (citing *Davis v. United States*, 564 U.S. 229, 236 (2011)). "Because the 'sole purpose' of the exclusionary rule is to deter future violations of the fourth amendment, however, its applicability requires some degree of police culpability, and 'the deterrence benefits of suppression must outweigh its heavy costs.' " *Id.* (quoting *Davis*, 564 U.S. at 236-37). Thus, under the good faith exception to the exclusionary rule, evidence obtained in violation of the fourth amendment will not be excluded if the police conducted the search " 'in objectively reasonable reliance on binding appellate precedent.' " *Turner*, 2018 IL App (1st) 170204, ¶ 56 (quoting *Davis*, 564 U.S. at 232). This is because under these circumstances, there is no improper police conduct to deter. *Id.* (citing *People v. LeFlore*, 2015 IL 116799, ¶ 24). Whether this standard has been met is a question of law subject to *de novo* review. *Harrison*, 2016 IL App (5th) 150048, ¶ 14.

¶ 51      Here, Trooper Scruggs testified that he believed the Illinois statutes providing for compulsory blood draws were valid, and the trial court expressly found that there was no police misconduct. As the defendant notes, however, Trooper Scruggs also acknowledged that he did not follow "the letter of the law to a T" because he did not read the "Warning to Motorist" to the defendant prior to the first blood draw. The defendant contends that this admission makes the good faith exception inapplicable. We disagree.

¶ 52      It is worth reiterating that when the defendant asked Trooper Scruggs whether she was required to perform field sobriety tests, he informed her that although she could refuse to do so, police would obtain a blood sample. This lends support to his assertion that he did, in fact, believe the law permitted him to take a compulsory blood draw. His concern with failure to fully comply with police protocol or the procedures involved in statutory summary suspension proceedings does

19

not negate this assertion. Moreover, the relevant inquiry is not what the officer subjectively knew about the state of the law. Rather, the question is whether a reasonably well-trained officer would have known that the search was invalid under the circumstances of the case. *Id.* ¶ 26.

¶ 53    The defendant argues that, because the accident occurred after the Supreme Court decided *McNeely*, any reliance on prior Illinois case law upholding the implied consent and compulsory testing statutes, such as *Jones*, was not objectively reasonable. Again, we disagree.

¶ 54    The *McNeely* Court expressly approved of implied consent laws that "impose significant consequences when a motorist withdraws consent." *McNeely*, 569 U.S. at 161 (opinion of Sotomayor, J., joined by Scalia, Ginsburg, and Kagan, JJ.). The Court explained that such laws give states "legal tools to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws." *Id.* at 160-61. The accident in this case occurred in April 2016. At that time, no published Illinois appellate decision had addressed the impact of *McNeely* on the validity of section 11-501.2(c)(2) or the holding in *Jones*. The only court to have considered any of the implied consent provisions was the Fourth District. As previously discussed, the Fourth District upheld section 11-501.6 in *Hasselbring*. See *Hasselbring*, 2014 IL App (4th) 131128, ¶ 43. In another case, the Fourth District also upheld the facial validity of section 11-501.1 after *McNeely*. See *People v. Gaede*, 2014 IL App (4th) 130346, ¶¶ 16, 24.[2] Considering the State of Illinois case law in April 2016, we conclude that Trooper Scruggs's reliance on the implied consent provisions was objectively reasonable. Because he acted in good

___

[2]We note that the *Gaede* court also found that there was no warrantless nonconsensual search because the defendant in that case revoked his implied consent and refused the test. *Gaede*, 2014 IL App (4th) 130346, ¶ 24. The court went on to consider and reject the defendant's arguments concerning the constitutional implications of the consequences for that refusal. *Id.* ¶¶ 25-26.

20

faith, we find that the exclusionary rule would not serve its purpose, and evidence of the first blood draw was therefore admissible.

¶ 55    Finally, even if we were to agree with the defendant that the court erred in admitting the results of the first blood draw, we would find this error to be harmless beyond a reasonable doubt. To establish harmless error, the State must demonstrate beyond a reasonable doubt that the result would have been the same without the error. *People v. Jackson*, 2020 IL 124112, ¶ 127.

¶ 56    Here, as the State points out, the defendant was charged with DUI under section 11-501(a)(2) of the Vehicle Code. See 625 ILCS 5/11-501(a)(2) (West 2014). That subsection does not require proof that her BAC was over 0.08; it merely requires proof that she was under the influence of alcohol to a degree that her ability to safely operate a vehicle was impaired. *People v. Weathersby*, 383 Ill. App. 3d 226, 229 (2008). There was evidence that the defendant demonstrated impairment while performing the field sobriety tests and admitted to having consumed alcohol. The responding officers detected the odor of alcohol and observed that the defendant's speech was slow and "thick-tongued" and that her eyes were glassy and bloodshot. In addition, the defendant admitted that she did not see Landers, even though the road conditions were good. The State points to several cases finding similar evidence sufficient to support convictions for DUI. See, *e.g.*, *Williams*, 2018 IL App (2d) 160683, ¶¶ 19-22; *Weathersby*, 383 Ill. App. 3d at 229-30. We must emphasize, however, that the standard for finding the evidence sufficient to convict a defendant is much lower than the standard for finding an error to be harmless beyond a reasonable doubt. Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Weathersby*, 383 Ill. App. 3d at 229. By contrast, as we have already stated, an error is harmless only if the State can prove beyond a reasonable doubt that a jury would

21

have reached the same result had the error not occurred. *Jackson*, 2020 IL 124112, ¶ 127. The evidence of impairment at the scene, standing alone, is not enough to meet this standard.[3] Thus, if we found that both blood draws had been admitted in error, we could not find the error to be harmless beyond a reasonable doubt.

¶ 57    Significantly, however, the second blood draw was obtained pursuant to a warrant. As such, evidence of the second draw was not subject to exclusion. That draw occurred at 11:55 a.m., nearly six hours after the accident. Testing indicated that at that time, the defendant's BAC was 0.078. Based on the estimated uncertainty, the toxicologist who tested the defendant's blood would have testified that the defendant's BAC was between 0.076 and 0.08 when her blood was drawn. We believe that any rational trier of fact would be aware that alcohol dissipates in the bloodstream over time even without expert testimony to tell them the precise rate at which it does so. We therefore believe any rational trier of fact would have found the defendant guilty beyond a reasonable doubt when presented with both the test results from the second blood draw and the evidence that she exhibited impairment at the scene. As such, any error in admitting evidence of the first blood draw was harmless beyond a reasonable doubt.

¶ 58                                III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the defendant's conviction and sentence.

¶ 60    Affirmed.

---

[3]We note that the State does not rely on the stipulation as to the opinion of Dr. Long, the toxicologist who performed retrograde extrapolation to determine the defendant's BAC at the time of the accident. It is not clear from the stipulation whether Dr. Long relied on the first blood draw, the second blood draw, or both in forming his opinion. Thus, we agree with both parties that we may not consider Dr. Long's opinion in determining whether any error in admitting evidence of the first blood draw was harmless.

*People v. Schantz*, 2022 IL App (5th) 200045

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of St. Clair County, No. 16-CF-1379; the Hon. Zina R. Cruse, Judge, presiding. |
| **Attorneys for Appellant:** | N. Scott Rosenblum and Nathan T. Swanson, of Rosenblum, Schwartz & Fry, P.C., of St. Louis, Missouri, for appellant. |
| **Attorneys for Appellee:** | James A. Gomric, State's Attorney, of Belleville (Patrick Delfino, Patrick D. Daly, of Trent Marshall, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |