2023 IL App (4th) 220091

NO. 4-22-0091

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 6, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| AARON PARLIER, | ) | No. 18CF92 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice DeArmond and Justice Doherty concurred in the judgment and opinion.

**OPINION**

¶ 1 In a bench trial, the circuit court of McLean County found defendant, Aaron Parlier, guilty of 10 counts of child pornography and 10 counts of predatory criminal sexual assault of a child. The court sentenced him to imprisonment for 450 years. He appeals on three grounds.

¶ 2 First, defendant argues that the circuit court erred by denying his motion to quash the search warrants and to suppress evidence. We uphold this ruling because we find the police officers' reliance upon the search warrant to have been in good faith.

¶ 3 Second, defendant claims that the indictment failed to set forth the nature of the child pornography offenses. We disagree. The language of the child pornography counts closely followed the language of the statute. By tracking the statutory language, the indictment caused defendant no prejudice.

¶ 4    Third, defendant contends that the State failed to prove him guilty of all 10 counts of child pornography and of any of the counts of predatory criminal sexual assault of a child. When we view all the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, the disputed elements of all 20 charged offenses.

¶ 5    Therefore, we affirm the judgment.

¶ 6                                    I. BACKGROUND

¶ 7    On January 30, 2018, Detective John Heinlen of the police department of Bloomington, Illinois, submitted to the circuit court a sworn "Complaint for Search Warrant." In his complaint, he recounted his recent interviews of Jane Doe, defendant, and A.G.

¶ 8    On September 21, 2017, when Heinlen interviewed Jane Doe, she was 17 years old. She told him that, from the time she was five or six until she was a freshman in high school, she took piano lessons from defendant. (Defendant's date of birth, Heinlen noted, was March 30, 1981.) The piano lessons took place in Bloomington. On several occasions, as Jane Doe grew older, defendant instructed her to take off her clothes after he had left the room and to play the piano while naked. His stated aim was to help her overcome stage fright before recitals. She became suspicious, however, that he was watching her, because one time, after she had put her clothes back on and he had reentered the room, he asked her why she had not fully undressed. She further told Heinlen that on two occasions, when she was in seventh or eighth grade, defendant touched her breasts with his hand. Also, she said that defendant had her try on a chain-mail bikini he had made. Finally, she recounted that when she was in her early teens, defendant e-mailed her three photographs of his erect penis, and he showed her a photograph of a woman's breasts on his telephone, telling her they were the breasts of his ex-girlfriend.

¶ 9 On December 5, 2017, Heinlen interviewed defendant. In this interview, which was audio-recorded, defendant admitted having Jane Doe play naked to help her overcome stage fright. He admitted sending her a photograph of his erect penis. He admitted having an ongoing sexual relationship with a former piano student of his, A.G. (who, Heinlen noted, was born on July 18, 1997). He admitted that, when A.G. was between 14 and 16 years old, he engaged in penetration with her on four or five occasions and oral sex on four or five occasions. Defendant said that, usually, these sexual encounters occurred in his vehicle or in his Bloomington apartment.

¶ 10 On January 25, 2018, Heinlen interviewed A.G. She told Heinlen that, from the ages of 6 to 11, she took piano lessons from defendant. She divulged that, from the time she was 12 years old and in seventh grade until her freshman year of high school, she and defendant had a sexual relationship, which included vaginal and oral penetration. A.G. provided the following additional details. Defendant engaged in penetration on 20 occasions or more, usually in his Bloomington apartment. Often, defendant video-recorded their sexual encounters, using a camcorder. He enjoyed tearing her clothing and underwear off her. Because of her experiences with defendant, A.G. believed he would have kept her torn clothing and the recordings of the sexual encounters.

¶ 11 On January 26, 2018 (Heinlen continued in his complaint), the police obtained a warrant to search defendant's residence at 1806 Pier Way, apartment 212, in Bloomington. When they executed the search warrant, the apartment appeared to have been vacated. The keys had been left on the kitchen counter. Management for the apartment complex told Heinlen that defendant had not been seen for a month and that he had not notified management he was moving out.

¶ 12 On January 30, 2018, the Bloomington police received an anonymous telephone call that defendant was driving a black Dodge Journey SUV. When defendant surrendered on an

arrest warrant in the 1300 block of Warner Street in Normal, Illinois, he told Detective Thomas Rena he had left his cellular telephone in his vehicle. A black Dodge Journey SUV was located nearby. It was parked in a business parking lot and was registered to defendant's brother, Shawn Parlier.

¶ 13 Later that same day, defendant's mother-in-law, Diane Martin, told Rena that defendant was living on Deer Lane in Mackinaw, Illinois. Rena saw a vehicle parked at 15930 Deer Lane that was registered to defendant's wife, Amanda Martin.

¶ 14 Those were the facts that Heinlen laid out in his complaint, under the heading of "Investigation." Under the heading of "Probable Cause," he explained why he had probable cause to believe that evidence relating to child pornography, predatory criminal sexual assault of a child, and criminal sexual assault would be found in computers, cellular telephones, cameras, or digital media in the house at 15930 Deer Lane and in the black Dodge Journey SUV. He relied on his training and experience as a police officer:

> "D.5. Based on my training, experience, and conversations with other detectives experienced in child pornography investigations, I know that it is common for people that possess images of child pornography to save those images to items of removable media such as [compact discs (CDs), digital video discs (DVDs), secured data (SD) cards], and other types of digital media.
>
> ***
>
> D.7. Based on my training, experience[,] and conversations with other detectives experienced in computer forensic investigations, I know that it is common for people who[ ] possess images of child pornography to also take pictures or videos of children in an attempt to either produce child pornography for

- 4 -

their own use or to trade to others in an attempt to increase their collection of child pornography. *** I know that these pictures and videos may be recovered from the computer hard drives, cellular phone, digital camera, digital video recorder[,] or other items of digital media even if deleted by the user. Furthermore, it is common for individuals who produce, view[,] and/or collect child pornography to retain possession of the child pornography and transfer it from an older digital storage device to a newer device over time."

¶ 15    On January 30, 2018, on the basis of Heinlen's complaint, a judge issued a warrant to search 15930 Deer Lane and the black Dodge Journey SUV for computers, cellular telephones, cameras, digital media, and other specified items. The police executed the search warrant that same day.

¶ 16    On March 28, 2018, a grand jury returned a bill of indictment, charging defendant with a total of 38 counts, which pertained to multiple different victims. The circuit court granted a motion by the defense to sever counts. The State chose to proceed on counts XIX through XXXVIII, the counts pertaining to a girl whose initials were E.W.

¶ 17    Counts XIX through XXVIII alleged that from April 15, 2012, through April 15, 2016, defendant committed offenses of child pornography. Originally, these counts alleged a violation of section 11-20.1(a)(1)(vii) of the Criminal Code of 2012 (720 ILCS 5/11-20.1(a)(1)(vii) (West 2012); 720 ILCS 5/11-20.1(a)(1)(vii) (West 2014); 720 ILCS 5/11-20.1(a)(1)(vii) (West 2016)). Before the bench trial, however, without objection by the defense, the circuit court allowed the State to replace the citations to section 11-20.1(a)(1)(vii) with citations to section 11-20.1(a)(1)(ii) (720 ILCS 5/11-20.1(a)(1)(ii) (West 2012); 720 ILCS 5/11-20.1(a)(1)(ii) (West 2014); 720 ILCS 5/11-20.1(a)(1)(ii) (West 2016)). The remaining 10 counts, counts XXIX through

XXXVIII, alleged that from April 15, 2012, through April 15, 2016, defendant committed offenses of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012); 720 ILCS 5/11-1.40(a)(1) (West 2014); 720 ILCS 5/11-1.40(a)(1) (West 2016)).

¶ 18 On December 18, 2018, defendant filed a motion to quash the search warrants and to suppress all evidence the police had seized pursuant to the warrants. The grounds for the motion were essentially threefold. First, defendant claimed that the events that supposedly created probable cause happened too long ago, or were "stale." Second, he asserted an absence of facts justifying a reasonable belief that he (1) lived in either the Pier Way apartment or the Deer Lane house, (2) kept his personal belongings at either address, or (3) possessed any of the items to be seized. Third, defendant claimed there was no nexus between the alleged offenses and the black Dodge Journey SUV. The circuit court denied the motion.

¶ 19 The bench trial took place on October 19, 2021. The State called Rena, who recounted his efforts to find out where defendant lived. After arresting defendant, Rena asked defendant what his residential address was. Defendant answered that because he had recently moved, he had not yet learned his new address. Rena then spoke with defendant's mother-in-law, who told him that defendant lived somewhere on Deer Lane in Mackinaw. Afterward, Rena "basically went down Deer Lane" and "saw a vehicle that matched Amanda Martin's vehicle." Martin was defendant's spouse, and when trying to locate her earlier in the day, Rena had learned that she drove a gray Kia Forte automobile. Driving down Deer Lane, he saw a gray Kia Forte parked in the driveway at 15903 Deer Lane. He read the license plate number through binoculars (having been ordered to keep his distance). He ran the plates and found out that the car was indeed registered to Martin.

¶ 20         In executing the search warrant at 15902 Deer Lane, Detective David Ashbeck found a Samsung laptop in the bedroom. This laptop, People's exhibit No. 1, contained the video files that were the bases of the child pornography counts in this case, counts XIX through XXVIII.

¶ 21         Detective Josh Swartzentruber was the digital forensic expert who had copied the video files from the laptop. These video files, People's exhibit Nos. 2 through 16, carried timestamps, so to speak. For each video file, two dates had been automatically generated: (1) the date the file was "created" or saved onto the laptop and (2) the date the file was last "written" or, in other words, last modified. The last-written dates were earlier than the file-created dates. For example, the file labeled 0009 had a file-created date of March 21, 2015, but a last-written date of February 9, 2015. Therefore, Swartzentruber inferred, the files existed on a different device before being uploaded to (or "created" on) the laptop. The last-written date, generated by the previous device, followed the file when it was saved onto the laptop. Also, from his forensic examination, Swartzentruber was able to tell that all of these video files existed before April 15, 2016, which was E.W.'s thirteenth birthday.

¶ 22         On cross-examination, Swartzentruber acknowledged that the laptop had not "successfully synchronize[d] with the network time protocol." His own forensic workstation had run into the same problem: he had attempted 56 times to synchronize with the network time protocol but had been unable to do so. He agreed that the lack of synchronization "might have an [e]ffect or [might have] skewed the time stamps of the files themselves." On redirect examination, however, he testified that the last-written date and time would be off "[j]ust probably by minutes." He testified, "[D]ue to my computer training and what I have dealt with in the past, I have only seen it move seconds to minutes." Defense counsel remarked to Swartzentruber:

          "Q. Yeah. When you had a computer that eventually did synchronize.

A. Yes.

Q Okay. In this scenario with this particular computer, it never synchronized.

A. It never did.

Q. So you don't have that gauge?

A. I did not have a gauge of timeframe."

¶ 23        But there was other evidence of the timeframe. E.W.'s mother testified that E.W., who was born on April 15, 2003, was younger than 13 in all the videos. She further testified substantially as follows. From the time E.W. was six, defendant came to their house and gave E.W. piano lessons in an upstairs bedroom. E.W. stopped taking piano lessons in October of her eighth-grade year. The prosecutor showed the mother 14 exhibits, each of which was a still image taken from videos that had been stored on the laptop. The mother identified E.W. in each picture and testified that E.W. appeared to be eight or nine in each picture. The mother further testified she had listened to (but had not watched) a video labeled "My Movie 4," which had been copied from the laptop. She recognized a voice in the video as being that of E.W. when she was eight or nine.

¶ 24        On cross-examination, the mother acknowledged she had not provided the prosecutor or the investigators a picture taken of E.W. when E.W. was 13. The mother answered no to the rather obscurely worded question "Do you have a picture of your daughter that you gave counsel a picture of your daughter that depicted her on her 13th birthday?" Nor, the mother admitted, had she provided the prosecutor or the investigators any recording of E.W.'s voice that

was made when E.W. was 13. Nor had the mother listened to such a recording so as to be able to compare it to the audio of "My Movie 4."

¶ 25    At the conclusion of the evidence, the parties made their closing arguments. The circuit court then took the matter under advisement. In a hearing three days later, the court announced its decision. The court found defendant guilty of all 10 counts of child pornography. Each of the video files, in the court's view, "showed different content" and, hence, a separate "reproduction." See 720 ILCS 5/11-20.1(a)(1) (West 2012); 720 ILCS 5/11-20.1(a)(1) (West 2014); 720 ILCS 5/11-20.1(a)(1) (West 2016). As for the counts of predatory criminal sexual assault of a child, the court rejected defendant's argument that the State had failed to prove that, at the time of the incidents, E.W. was under the age of 13. See 720 ILCS 5/11-1.40(a)(1) (West 2012); 720 ILCS 5/11-1.40(a)(1) (West 2014); 720 ILCS 5/11-1.40(a)(1) (West 2016). The court found E.W.'s mother to be credible in her testimony that E.W. appeared to be eight or nine in the photographs. Also, the court believed Swartzentruber's testimony that the timestamps, which predated E.W.'s thirteenth birthday, could have been off by no more than minutes or seconds. Therefore, the court additionally found defendant guilty of all 10 counts of predatory criminal sexual assault of a child.

¶ 26    On January 14, 2022, after hearing and denying defendant's posttrial motion, the circuit court held a sentencing hearing. The court imposed prison terms totaling 450 years.

¶ 27    On February 4, 2022, defendant filed his notice of appeal.

¶ 28                                II. ANALYSIS

¶ 29                          A. The Good-Faith Exception

¶ 30    Section 114-12(a)(2) of the Code of Criminal Procedure of 1963 provides that "[a] defendant aggrieved by an unlawful search and seizure may move the court for the return of

property and to suppress as evidence anything so obtained on the ground that *** there was not probable cause for the issuance of the warrant." 725 ILCS 5/114-12(a)(2) (West 2018). The statute, however, qualifies this remedy by providing, "The court shall not suppress evidence which is otherwise admissible in a criminal proceeding if the court determines that the evidence was seized by a peace officer who acted in good faith." *Id.* § 114-12(b)(1). The statute defines "good faith" to include legitimate reliance on a search warrant:

> "(2) 'Good faith' means whenever a peace officer obtains evidence:
>
> (i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid[.]" *Id.* § 114-12(b)(2)(i).

Thus, despite the lack of probable cause to support the issuance of a search warrant, a motion for the suppression of evidence should be denied if the police obtained the evidence in "good faith," as defined above.

¶ 31     Quoting *People v. Lyons*, 373 Ill. App. 3d 1124, 1127 (2007), defendant notes that the appellate court "applies a *de novo* standard of review when reviewing a trial court's ruling on a motion to suppress when, like here, 'the underlying facts are not in dispute and the only question is the adequacy of the affidavit attached to the complaint for the warrant.' " On the other hand, the State cites a more recent decision, *People v. Pettis*, 2015 IL App (4th) 140176, ¶ 17, in which the Fourth District prescribed "great deference" to the issuing judge's finding of probable cause for the issuance of a search warrant. There is no contradiction between these two standards of review, considering that the assessment of probable cause does not always determine the ruling on the

suppression motion. In other words, a lack of probable cause for the issuance of the search warrant cause does not automatically necessitate a subsequent suppression of evidence. If, for example, the searching police officers' reliance on the search warrant was in good faith, the evidence should not be suppressed even if a court later concludes that the search warrant was unsupported by probable cause. See 725 ILCS 5/114-12(b)(1) (West 2018); *People v. Schantz*, 2022 IL App (5th) 200045, ¶ 50. While according great deference to the issuing judge's finding of probable cause (see *Pettis*, 2015 IL App (4th) 140176, ¶ 17), the reviewing court decides *de novo* whether police officers' reliance on the search warrant was in good faith (*Schantz*, 2022 IL App (5th) 200045, ¶ 50)—and, therefore, reviews *de novo* the ruling on the motion for suppression of evidence (see *People v. Aljohani*, 2022 IL 127037, ¶ 28).

¶ 32　　　　　A lack of probable cause would make no difference to the disposition of the case if the police officer obtained the evidence in good faith. See 725 ILCS 5/114-12(b)(1) (West 2018); *Schantz*, 2022 IL App (5th) 200045, ¶ 50. The supreme court has "cautioned *** that courts of review should not ordinarily consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided." *People v. White*, 2011 IL 109689, ¶ 144. Also, the supreme court has directed courts to refrain from deciding constitutional issues if the case can be decided on nonconstitutional grounds. See *id.*; *In re Haley D.*, 2011 IL 110886, ¶ 54; *People v. McDaniel*, 164 Ill. 2d 173, 180 (1995); *In re Estate of Longeway*, 133 Ill. 2d 33, 44 (1989). Whether a search warrant was supported by probable cause is a constitutional issue (see U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 6), whereas the exclusionary rule and its good-faith exception are nonconstitutional doctrines (see *Pennsylvania Board of Probation & Parole v. Scott*, 524 U.S. 357, 363 (1998); *United States v. Leon*, 468 U.S. 897, 906 (1984); *People v. Manzo*, 2018 IL 122761, ¶ 62; *People v. Smith*, 2022 IL App (1st)

190691, ¶ 117 (Coghlan, J., specially concurring)). Accordingly, in the interest of judicial restraint, we proceed directly to the question of whether "the evidence was seized by a peace officer who acted in good faith." 725 ILCS 5/114-12(b)(1) (West 2018).

¶ 33    For two reasons, defendant contends that no police officer could have reasonably believed that the warrant to search 15902 Deer Lane and the black Dodge Journey SUV was valid: (1) the information in Heinlen's complaint was stale, and (2) the complaint failed to provide any facts establishing a nexus between the alleged offenses, defendant, and the places to be searched.

¶ 34                                    1. *Staleness*

¶ 35    Whether probable cause exists "turns on the totality of the circumstances and facts known to the officers and court when the warrant is applied for." (Internal quotation marks omitted.) *People v. Tisler*, 103 Ill. 2d 226, 236 (1984). One such circumstance is how much time has passed since the events described in the complaint. See *People v. Montgomery*, 27 Ill. 2d 404, 405 (1963). "There is no hard-and-fast rule concerning the time within which a complaint for a search warrant must be made, except that it should not be too remote." *Id.* As the cases put it, the information in the affidavit must not be stale. See *People v. Beck*, 306 Ill. App. 3d 172, 179 (1999).

¶ 36    Jane Doe was 17 years old when she recounted to Heinlen her experiences with defendant. According to Jane Doe, from the time she was five or six years old until she was a freshman in high school, she took piano lessons from defendant, and sometimes, at his direction, she played the piano while naked. Jane Doe was 5 years old 12 years before the interview ($17 - 5 = 12$). She was 6 years old 11 years before the interview ($17 - 6 = 11$). Because high-school freshman are generally 14 or 15 years old, she was a freshman 2 or 3 years before the interview ($17 - 15 = 2$ and $17 - 14 = 3$). It follows that the piano lessons began 11 or 12 years before the interview and ended 2 to 3 years before the interview. Thus, the events that Jane Doe recounted to

Heinlen were as recent as 2 years before the interview and as long ago as 12 years before the interview.

¶ 37         A.G. was born on July 18, 1997. Therefore, she was 20 years old on January 25, 2018, when Heinlen interviewed her. According to A.G., from the time she was 12 until her freshman year of high school, she and defendant had a sexual relationship. So, their sexual relationship began 8 years before the interview (20 – 12 = 8) and ended 5 or 6 years before the interview (20 – 15 = 5 and 20 – 14 = 6). To put it differently, the events that A.G. recounted to Heinlen were as recent as five years in the past and as long ago as eight years in the past.

¶ 38         For three reasons, a reasonable police officer could credit the judge's determination that the events described in Heinlen's complaint were not stale.

¶ 39         First, even assuming that, in the context of child pornography, the passage of 12 years results in staleness, Jane Doe was 5 years old 12 years before the interview, and the complaint gave no reason to suppose that defendant had engaged in sexual conduct with girls as young as 5. It was not until A.G. was 12 that he began having a sexual relationship with her. Jane Doe was 12 about 5 years before Heinlen interviewed her. So, even though Jane Doe began taking piano lessons from defendant 12 years before the interview, it might have seemed more probable, from A.G.'s experience, that defendant's sexual conduct toward Jane Doe took place in more recent years. It seems unlikely, for instance, that he made a chain-mail bikini for Jane Doe when she was five.

¶ 40         Second, a police officer "may reasonably rely on precedents from *** federal circuits for purposes of the good-faith exception." *People v. Potts*, 2021 IL App (1st) 161219, ¶ 117 (citing *People v. LeFlore*, 2015 IL 116799, ¶ 54). One such federal precedent might be *United States v. Riccardi*, 405 F.3d 852 (10th Cir. 2005). In that case, when executing a warrant

to search the defendant's residence, the police found not only physical photographs of nude boys but also a Kinko's receipt for the copying of four Polaroid photographs to computer discs. *Id.* at 858. On the basis of what the police found in their search of the residence, a judge granted their request for a second warrant, this one to search the defendant's computer. *Id.* Child pornography was found on the hard drive of the computer. *Id.* On appeal, the defendant "argue[d] that the Kinko's receipt, being five years old, [was] too stale to support probable cause." *Id.* at 860. The Tenth Circuit disagreed on the following reasoning. See *id.* at 861. Because child pornography was illegal and carried a severe social stigma, its "initial collection [was] difficult." (Internal quotation marks omitted.) *Id.* Consequently, "[h]aving succeeded in obtaining images, collectors [were] unlikely to destroy them" but, instead, would "maintain their materials for significant periods of time." (Internal quotation marks omitted.) *Id.*

¶ 41      To take another example, in *United States v. Ramsburg*, 114 F. App'x 78, 79-80 (4th Cir. 2004), it had been more than six years since the defendant e-mailed an image of child pornography to an undercover FBI agent. On appeal, the defendant argued that the Fourth Circuit "should discredit the prior transmission of an illegal image as a stale basis for probable cause." *Id.* at 82. The Fourth Circuit declined to do so, reasoning that "findings of staleness become less appropriate when the instrumentalities of the alleged illegality tend to be retained." *Id.* In reversing the suppression of the evidence, the Fourth Circuit quoted the FBI agent's averment that "most collectors of child pornography 'rarely *** dispose of their sexually explicit materials.' " *Id.*

¶ 42      The State cites *United States v. Carroll*, 750 F.3d 700, 704 (7th Cir. 2014), in which, according to the detective's affidavit, the defendant photographed the victim's bare genitals five years earlier. "In recognition of the well-established hoarding habits of collectors of child pornography" (*id.*), the Seventh Circuit "conclude[d] that the information in [the detective's]

affidavit was sufficient to establish a fair probability that the computer or other digital storage devices within [the defendant's] residence would contain evidence of child pornography or sexual exploitation of a child, despite the fact that the photographs were taken approximately five years earlier" (*id.* at 708).

¶ 43 It is true that *Riccardi*, *Ramsburg*, and *Carroll* have their own facts, which are not the facts of this case. "Whether there is a substantial basis for a finding of probable cause to issue a warrant is fact-specific." 68 Am. Jur. 2d *Searches & Seizures* § 199 (2022). For that reason, it might be argued that cases such as *Riccardi*, *Ramsburg*, and *Carroll* are distinguishable. Nevertheless, those federal cases are not so clearly inapposite that it would have been unreasonable of Bloomington police officers to rely on them.

¶ 44 Arguably, *Carroll* includes reasoning that is especially relevant to the present case. The Seventh Circuit reasoned that "[w]hile pornographic images of anonymous children could be replaced with images of other anonymous children, [the defendant's] images of the *** victim were irreplaceable to him" because she was someone "whom he had personally molested." *Carroll*, 750 F.3d at 705. This logic in *Carroll* could be applied, in good faith, to defendant's camcorder recordings of the sexual encounters between himself and A.G.

¶ 45 Third, "under the good faith exception to the exclusionary rule, evidence obtained in violation of the fourth amendment will not be excluded if the police conducted the search in objectively reasonable reliance on binding appellate precedent." (Internal quotation marks omitted.) *Schantz*, 2022 IL App (5th) 200045, ¶ 50. In *People v. Jaynes*, 2014 IL App (5th) 120048, ¶ 41, the appellate court said, "Computer files have a distinctive nature, especially computer files of child pornography. While staleness is highly relevant to the legality of a search for perishable

- 15 -

or consumable objects, it is rarely relevant in the context of computer files." The appellate court went on to explain in *Jaynes*:

> "People with an interest in child pornography tend to hoard their materials and retain them for a long time. [Citation.] Because child pornography is illegal, it is difficult and risky to obtain, so collectors are not quick to discard it. [Citation.] Information concerning child pornography has a relatively long shelf life and should not be quickly deemed stale. [Citation.] Images stored on computers can be retained almost indefinitely, and forensic examiners can often uncover evidence of possession or attempted possession long after the crime has been completed. [Citation.]" (Internal quotation marks omitted.) *Id.*

Thus, the appellate court concluded, "[o]nly in the exceptional case should a warrant to search a computer for child pornography be denied on the ground of staleness." *Id.*

¶ 46     What qualifies as an "exceptional" length of time for retaining child pornography is far from obvious. Defendant cites cases holding that the passage of two months (*id.* ¶ 42), five months (*People v. Donath*, 357 Ill. App. 3d 57, 63 (2005)), and seven months (*United States v. Seiver*, 692 F.3d 774, 777-78 (7th Cir. 2012)) did not make the evidence stale. He infers that, by contrast, the passage of several years would make the evidence stale. In *Jaynes*, *Donath*, and *Seiver*, however, the courts never suggested that periods longer than the ones they had been asked to consider would require a finding of staleness. See *Carroll*, 750 F.3d at 705 (remarking that because "[t]here is no bright line rule for determining staleness," "we are not obligated to deem the information at issue in this case stale just because it is older than information at issue in any previous case" (internal quotation marks omitted)). Nothing in Illinois case law delineates the outer limits of freshness in child pornography cases. Such ambiguity in the case law would make a

- 16 -

reasonable police officer heavily dependent on the legal expertise of the judge. "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination ***." *Leon*, 468 U.S. at 921. "Because the sole purpose of the exclusionary rule is to deter future violations of the fourth amendment, *** its applicability requires some degree of police culpability ***." (Internal quotation marks omitted.) *Schantz*, 2022 IL App (5th) 200045, ¶ 50. Given the lack of a "hard-and-fast rule" (*Montgomery*, 27 Ill. 2d at 405) and given the marginal relevance of staleness in child pornography cases (see *Jaynes*, 2014 IL App (5th) 120048, ¶ 41), we are unconvinced that the Bloomington police were at fault for relying on the issuing judge's determination that the information in Heinlen's complaint was not stale.

¶ 47                                      2. *Nexuses*

¶ 48                          a. A Nexus Between Defendant and the Residence

¶ 49          Quoting *People v. Teague*, 2019 IL App (3d) 170017, ¶ 11, defendant notes that probable cause for the issuance of a search warrant requires "a sufficient nexus between a criminal offense, the items to be seized, and the place to be searched." (Internal quotation marks omitted.) One of the places to be searched was the house at 15930 Deer Lane. According to defendant, the complaint "failed to establish any link between [the child-pornography] allegations and the residence or the residence and [him]." He argues that just because his mother-in-law told the police he lived on Deer Lane, "[s]uch a statement could not possibly amount to probable cause to search a specific address on the street." Also, he continues, just because the police saw, parked in the driveway at 15930 Deer Lane, a vehicle registered to his wife, it did not necessarily follow that either she or he lived at that address. She could have been visiting, or someone could have borrowed her vehicle.

¶ 50    Defendant implies that until it was known with certainty that he lived at 15930 Deer Lane—until all other possibilities had been disproved—there was an insufficient nexus between himself and that address. But "[p]robable cause deals with probabilities, not certainties." *People v. Hill*, 2020 IL 124595, ¶ 24. In fact, the level of probability required for probable cause need not even be more likely than not. See *id.* Granted, probable cause "means more than bare suspicion" (*People v. Jones*, 215 Ill. 2d 261, 273 (2005)), but probable cause is less than proof by a preponderance of the evidence (see *Hill*, 2020 IL 124595, ¶ 24). Having been informed by an apparently reliable source that an individual lives somewhere on a certain street, an ordinary person, upon seeing the vehicle of the individual's spouse parked at an address on that street, would have more than a *hunch* that the individual lives at that address. See *People v. Sims*, 192 Ill. 2d 592, 615 (2000) (explaining that "a determination of probable cause is governed by commonsense, practical considerations, and not by technical legal rules"). Under the circumstances, it would be only natural to assume that the individual lives at that address. After all, people tend to park where they live, and individuals tend to live with their spouses. Admittedly, there would be other possibilities, as defendant points out, but probable cause is not certainty, and it need not rule out other possibilities. See *Hill*, 2020 IL 124595, ¶ 24. We find, therefore, that a reasonable police officer could rely on the issuing judge's finding of a nexus between defendant and 15930 Deer Lane. See 725 ILCS 5/114-12(b)(2)(i) (West 2018).

¶ 51    b. A Nexus Between Evidence of Crime and the Residence

¶ 52    In his complaint, Heinlen averred that, from his training and experience and from his conversations with detectives who were experienced in child pornography investigations and computer forensic investigations, he had become aware of practices that were common among people who possessed child pornography. It was common for them to save child pornography to

"removable media such as CD's, DVD's, [and] SD cards." Also, it was common for them to "retain possession of the child pornography and transfer it from an older digital storage device to a newer device over time."

¶ 53    Defendant contends that Heinlen's training and experience and his conversations with other detectives were insufficient bases for forming a belief that defendant "ever converted at least *six year old* camcorder recordings" to newer digital formats or that "he still possessed the original recordings." (Emphasis in original.) According to defendant, "the complaint failed to prove any factual circumstances to support a nexus between the detective's training and experience and that the evidence would be located at 15930 Deer Lane." Defendant cites *People v. Rojas*, 2013 IL App (1st) 113780, ¶ 18, in which the First District affirmed the quashing of a search warrant, because, in the view of the First District, it was "mere conjecture" by a police officer that drug trafficking records would be found in a drug trafficker's home, considering that the defendant had conducted all his apparent drug trafficking away from his home.

¶ 54    In *Beck*, 306 Ill. App. 3d at 181, however, the First District reversed the quashing of a search warrant and, in so doing, rejected the very reasoning the First District later used in *Rojas*. In *Beck*, even though there was no indication that any drug trafficking had occurred at the defendant's residences, the First District upheld the finding of probable cause to search the residences, because a police officer had averred that, in his experience, drug traffickers ordinarily kept their records in their homes. *Id.* at 178. Significantly, in *Lyons*, 373 Ill. App. 3d at 1128, the Fourth District followed *Beck*. "Where two or more appellate districts are in conflict[,] the circuit court should follow the decision of the appellate court of its district." *People v. Thorpe*, 52 Ill. App. 3d 576, 579 (1977). Because the McLean County circuit court was in the Fourth District, a

reasonable police officer would have expected the court to follow *Lyons* (and *Beck*) over *Rojas*. See *id.*

¶ 55    Besides, a few years after deciding *Rojas*, the First District endorsed the commonsensical assumption that people generally keep their possessions where they live. In *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 49, the First District said,

> "Although we certainly agree that probable cause to arrest does not always equate to probable cause to search the arrestee's home, it is reasonable to infer, absent evidence to the contrary, that a person will generally keep possessions, including possessions that link that person to the crime, in his or her home."

In Heinlen's complaint, we see no facts "undermin[ing] the common, justified assumption that possessions," including child pornography, "are generally kept in the home." *Id.* ¶ 50. As the Tenth Circuit remarked,

> "The observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases. *** Because of their illegality and the imprimatur of severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence." (Internal quotation marks omitted.) *Riccardi*, 405 F.3d at 861.

Because common sense and case law point to the residence as the place where child pornography most likely would be stored, the Bloomington police could rely in good faith on the judge's finding of a nexus between evidence of the crime and the residence. See 725 ILCS 5/114-12(b)(1) (West 2018).

¶ 56    c. A Nexus Between Evidence of Crime and the Black Dodge Journey SUV

¶ 57     On January 30, 2018, according to the complaint, the Bloomington Police Department received an anonymous telephone call that defendant was driving a black Dodge Journey SUV. When defendant was arrested in the 1300 block of Warner Street in Normal, Illinois (the complaint continues), he told Detective Rena he had left his cellular telephone in his vehicle. A black Dodge Journey SUV was located in a nearby parking lot. The vehicle was registered to defendant's brother, Shawn Parlier. On the basis of that information, the search warrant authorized the police to search the vehicle.

¶ 58     Defendant argues that anonymous tips are too unreliable to create probable cause for the issuance of a search warrant. He notes that the tipster never provided the police a license plate number. Defendant maintains that "none of the information provided within the Complaint establish[es] that any items or indicia of criminal activity relating to the case would be present inside Mr. Shawn Parlier's vehicle."

¶ 59     In its brief, the State does not specifically address the question of probable cause to search the vehicle. It is unclear, however, what is at stake in defendant's challenge of the search of the vehicle. Defendant is supposed to provide us the facts necessary to an understanding of the case (see Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020)), including facts showing how the purported errors he raises on appeal made a difference in the outcome. We are not supposed to decide academic questions. See *People ex rel. Johnson v. Doglio*, 43 Ill. App. 3d 420, 421 (1976). As the supreme court puts it, "[c]ourts of review will *** ordinarily not consider issues that are not essential to the disposition of the causes before them or where the results are not affected regardless of how the issues are decided." *Peach v. McGovern*, 2019 IL 123156, ¶ 64. Even if we assumed, for the sake of argument, that (1) there was no probable cause to search the Dodge Journey SUV and (2) the police could not have relied in good faith on the judge's finding of such probable cause

(see 725 ILCS 5/114-2(b)(1) (West 2018)), the remedy would have been the exclusion of "any evidence obtained by exploiting that violation" (*People v. Henderson*, 2013 IL 114040, ¶ 33). We are unclear what this evidence is. Defendant does not explain what evidence the police found in the vehicle or what evidence they found as a result of their search of the vehicle. Therefore, this issue of the vehicle search appears to be abstract and, as such, unfit for judicial resolution. See *Peach*, 2019 IL 123156, ¶ 64.

¶ 60                    B. A Claimed Defect in the Indictment

¶ 61        Counts XIX to XXVIII of the indictment, as amended, charged that from about April 15, 2012, to about April 15, 2016, defendant violated section 11-20.1(a)(1)(ii) of the Criminal Code of 2012 (720 ILCS 5/11-20.1(a)(1)(ii) (West 2012); 720 ILCS 5/11-20.1(a)(1)(ii) (West 2014); 720 ILCS 5/11-20.1(a)(1)(ii) (West 2016)) by committing offenses of child pornography. These counts closely follow the language of section 11-20.1(a)(1)(ii) by alleging that he "filmed, videotaped[,] or otherwise depicted or portrayed by means of any similar visual medium or reproduction or depicted by computer a minor child." He claims that the disjunction of the allegations in each of these 10 counts (that is to say, the uses of "or") "prevented [him] from being fully apprised of the nature of the charges and violated [his] due process rights." He compares counts XIX to XXVIII to the defective criminal complaint in *People v. Heard*, 47 Ill. 2d 501 (1970).

¶ 62        In *Heard*, the State charged the defendants with gambling, a violation of section 28-1(a)(8) of the Criminal Code of 1961 (Ill. Rev. Stat. 1967, ch. 38, ¶ 28-1(a)(8)). *Heard*, 47 Ill. 2d at 502. That statute provided, "A person commits gambling when he" "[s]ets up or promotes any policy game or sells, offers to sell[,] or knowingly possesses or transfers any policy ticket, or other similar device." Ill. Rev. Stat. 1967, ch. 38, ¶ 28-1(a)(8). (A "policy game" is an archaic term

for a lottery. See *Forte v. United States*, 83 F.2d 612, 615-16 (D.C. Cir. 1936).) The criminal complaint in *Heard* was phrased disjunctively, as was the statute. *Heard*, 47 Ill. 2d at 505. The supreme court cautioned in *Heard* that if the language in a criminal statute was disjunctive, it would not always suffice for the charging instrument to track the statutory language. If the statute listed "disparate and alternative acts," it was impermissible for the charging instrument to simply parrot the statute. *Id.* at 504-05. The supreme court held, "While a charge which follows the language of the statute defining the crime and uses the disjunctive 'or' will be sufficient in some circumstances, it will not be sufficient where the statute names disparate and alternative acts, any one of which will constitute the offense." *Id.* at 504. The antigambling statute listed acts that were significantly different from one another. "The promoting of a policy game," the supreme court observed, was "not the same act as transferring a policy ticket, for example." *Id.* at 504-05. Because the acts that the charging instrument disjunctively alleged were "disparate," the supreme court concluded that the charging instrument failed to "set forth the nature and elements of the" offense with sufficient certainty. *Id.* This defect, the supreme court concluded, made the charging instrument "void and vulnerable to attack at any time." *Id.* Thus, under *Heard*, if the "alternate" "acts" alleged in the charging instrument are "disparate"—or "markedly distinct in quality or character" (Merriam-Webster's Collegiate Dictionary 360 (11th ed. 2020))—the charging instrument is void and is subject to challenge at any time. Defendant challenges counts XIX to XVIII, arguing that the disjunctive language of those counts is comparable to the disjunctive language of the criminal complaint in *Heard*.

¶ 63        The State counters that *Heard* is (1) distinguishable and (2) superseded. First, the State disputes that the child pornography counts are comparable to the criminal complaint in *Heard*. The State argues that, instead of alleging "alternative acts" (*Heard*, 47 Ill. 2d at 504), counts

XIX to XXVIII merely gave the prosecution "flexibility as to the physical form of the" videos that defendant produced (see *People v. Phillips*, 215 Ill. 2d 554, 564 (2005)). Second, the States points out that *Heard* predates the change in the law wrought by *People v. Pujoue*, 61 Ill. 2d 335 (1975). In *Pujoue*, the supreme court held, "When attacked for the first time on appeal[,] a complaint is sufficient if it apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct." *Id.* at 339; see also *People v. King*, 253 Ill. App. 3d 705, 707-08 (1993). The State notes that, before the trial, it disclosed to the defense the child pornography videos of E.W. The State further notes that the defense never filed a bill of particulars. Also, the State notes that when it moved to amend the child pornography counts, the defense never objected. Finally, the State notes that, immediately before the bench trial, defendant told the circuit court he had no questions about the child pornography counts. Therefore, the State argues, defendant has failed to show prejudice within the meaning of *Pujoue*.

¶ 64        We agree with the State that, not only is *Heard* distinguishable, but *Heard* has been superseded by the prejudice standard in *Pujoue*. First, as to distinguishability, counts XIX to XXVIII do not allege "alternative acts." *Heard*, 47 Ill. 2d at 504. Rather, each of those counts alleges a single act of creating child pornography. The disjunction is only in the alternative technical means of accomplishing that act. See *Phillips*, 215 Ill. 2d at 564 (remarking that "[t]he disjunctive language in each count simply gave the State flexibility as to the physical form of the pictures"). More to the point, it no longer is the law that alleging "disparate and alternative acts" (*Heard*, 47 Ill. 2d at 504) automatically makes a charging instrument "void and vulnerable to attack at any time" (*id.* at 505). Rather, "to prevail in a challenge to an indictment that is raised for the

first time on appeal, the defendant must show prejudice in the preparation of her defense." *People v. Davis*, 217 Ill. 2d 472, 479 (2005).

¶ 65    Although defendant claims prejudice, he makes no convincing showing of prejudice. He complains that "the [S]tate failed to provide proper notice of the specific *act* listed by [the] [c]hild [p]ornography statute [he] was accused of committing." (Emphasis added.) Again, however, as we have explained, the disjunction was not in the act but in the technological means of accomplishing the act. If the charging instrument accuses a defendant of committing an offense by doing X, Y, or Z, the defendant has received fair notice that he or she must come to court prepared to defend against X, Y, and Z. Nor does the other part of the *Pujoue* test give any cause for concern. Because the record clearly shows the items of child pornography that defendant was convicted of producing, there is no danger of double jeopardy. See *People v. Wallace*, 210 Ill. App. 3d 325, 337 (1991) (remarking that "the defendant may have recourse to the record in this case as a bar against any future prosecution for the same offense"). Therefore, we reject his challenge to the indictment.

¶ 66                    C. The Sufficiency of the Evidence

¶ 67            1. *The Question of Whether the Evidence Was Sufficient to Support*

*Convictions on All 10 Counts of Child Pornography as Opposed to*

*Convictions on Only 5 Counts of Child Pornography*

¶ 68    Again, there were 10 counts of child pornography, counts XIX to XXVIII. After the close of evidence, the prosecutor argued to the circuit court that People's exhibit Nos. 3, 4, 5, and 6, which were originally a single file on defendant's laptop, supported a conviction on one count of child pornography. (The video file was so large that the extraction software broke it up into four files.) The remaining nine counts of child pornography, the prosecutor argued, were

proven by nine more video files from the laptop, People's exhibit Nos. 8 to 16. Agreeing with these suggested units of prosecution, the circuit court found defendant guilty of all 10 counts of child pornography.

¶ 69 Defendant maintains that the circuit court should have found him guilty of only five counts of child pornography, because it was evident, from the contents of the video exhibits, that in the very beginning there were only five videos. These original five videos, defendant suggests, were afterward broken up into the 10 items of footage that were the bases of counts XIX to XXVIII. He uses the following reasoning to accomplish this reconstruction. People's exhibit Nos. 3 to 6 and 14 to 15 all show oral penetration, with E.W. dressed in a white and pink flower shirt. Those exhibits came from the first video. People's exhibit No. 7 shows vaginal penetration. That exhibit was the second video. People's exhibit No. 8 shows oral penetration, with E.W. wearing a white shirt and pink sweatpants. That exhibit was the third video. People's exhibit Nos. 9 and 10 show oral penetration, with E.W. wearing a deer shirt. Those exhibits came from the fourth video. Finally, People's exhibit Nos. 11 to 13 show oral penetration, with E.W. nude on a white carpet. Those exhibits came from the fifth video.

¶ 70 The circuit court found that, "even if not [10] separate acts, the content of the exhibits show reproductions at different angles or different positions." Under section 11-20.1(a)(1), a person committed the offense of child pornography by "film[ing], videotap[ing], photograph[ing], or otherwise depict[ing] or portray[ing] by means of any similar visual medium or *reproduction* or depict[ing] by computer" the child engaged in an act of sexual penetration. (Emphasis added.) 720 ILCS 5/11-20.1(a)(1)(ii) (West 2012); 720 ILCS 5/11-20.1(a)(1)(ii) (West 2014); 720 ILCS 5/11-20.1(a)(1)(ii) (West 2016). The court found 10 such reproductions. Defendant challenges the court's finding that the video exhibits were 10 "reproductions" within

the meaning of the child pornography statute. Section 11-20.1(f)(3) defines " '[r]eproduce' " as "to make a duplication or copy." 720 ILCS 5/11-20.1(f)(3) (West 2012); 720 ILCS 5/11-20.1(f)(3) (West 2014); 720 ILCS 5/11-20.1(f)(3) (West 2016). Defendant disputes that he copied or duplicated *the original videos*. He reasons that "numerous angles of sex acts depicted on individual continuous videos were not duplications or copies." According to him, "the evidence showed the videos were broken down into smaller files when they were uploaded from the camcorder to the computer." He argues, "[T]he fact that one continuous video was cut into separate computer files does not amount to 'reproduction.' "

¶ 71       The cutting, however, entailed copying. By copying onto the hard drive of his laptop an image of child pornography from his camcorder, defendant made a "visual *** reproduction" of the child pornography, even if the original video included other images as well. 720 ILCS 5/11-20.1(a)(1)(ii) (West 2012); 720 ILCS 5/11-20.1(a)(1)(ii) (West 2014); 720 ILCS 5/11-20.1(a)(1)(ii) (West 2016). Under the language of section 11-20.1(a)(1)(ii), the question is not whether he reproduced the complete video but whether he reproduced a photographic portrayal of a child engaged in sexual penetration. Arguably, when the evidence is viewed in a light most favorable to the prosecution (see *People v. Patterson*, 314 Ill. App. 3d 962, 968-69 (2000)), the exhibits corresponding to the 10 counts of child pornography were 10 visual reproductions as described in section 11-20.1(a)(1) and (f)(3).

¶ 72       Those exhibits could also be regarded as "depict[ions] by computer" of a child engaged in acts of sexual penetration. 720 ILCS 5/11-20.1(a)(1) (West 2012); 720 ILCS 5/11-20.1(a)(1) (West 2014); 720 ILCS 5/11-20.1(a)(1) (West 2016). The statute provides the following relevant definition:

"(5) 'Depiction by computer' means a computer program or data that, after being processed by a computer either alone or in conjunction with one or more computer programs, results in a visual depiction on a computer monitor, screen, or display." 720 ILCS 5/11-20.1(f)(5) (West 2012); 720 ILCS 5/11-20.1(f)(5) (West 2014); 720 ILCS 5/11-20.1(f)(5) (West 2016).

Viewing all the evidence in a light most favorable to the prosecution, we conclude it would be possible for a rational trier of fact to find, beyond a reasonable doubt, that People's exhibit Nos. 3 to 6 as a unit and People's exhibit Nos. 8 to 16 individually were depictions by computer of E.W. engaged in acts of sexual penetration. See *Patterson*, 314 Ill. App. 3d at 968-69. Defendant admits in his brief, "[T]he evidence showed the videos were broken down into smaller files when they were uploaded from the camcorder to the computer." Section 11-20.1(a)(1) criminalized not only the making of the camcorder videos but also the subsequent depictions of E.W. by computer— computer depictions created by uploading data from the camcorder to the computer. By creating video files on his computer, defendant "generate[d] *** data that, after being processed by [the] computer ***, result[ed] in a visual description on a computer monitor." 720 ILCS 5/11-20.1(f)(4) (West 2012); 720 ILCS 5/11-20.1(f)(4) (West 2014); 720 ILCS 5/11-20.1(f)(4) (West 2016). According to Swartzentruber's testimony, the files were in the video directory of the laptop. The purpose of a video directory is to hold video files that can be watched "on a computer monitor, screen, or display." Applying our highly deferential standard of review, then, we find sufficient evidence to support the convictions on counts XIX to XXVIII. See *People v. Boose*, 2021 IL App (2d) 190416-U, ¶ 79.

¶ 73                    2. *Proof That E.W. Was Under the Age of 13*

¶ 74　　　　To prove the offenses of predatory criminal sexual assault alleged in counts XXIX through XXXVIII, the State had to prove that when defendant committed the acts of sexual penetration, E.W. was "under 13 years of age." 720 ILCS 5/11-1.40(a)(1) (West 2012); 720 ILCS 5/11-1.40(a)(1) (West 2014); 720 ILCS 5/11-1.40(a)(1) (West 2016). The State called E.W.'s mother, who testified that after looking at still photos from the video exhibits and after listening to the audio of "My Movie 4," she believed that E.W. was eight or nine at the time the videos and the audio recording were made.

¶ 75　　　　Defendant contends that this testimony by the mother was insufficient to prove, beyond a reasonable doubt, that E.W. was under 13 when defendant committed the acts of sexual penetration. The mother admitted she had done nothing to refresh her recollection of how E.W. looked and sounded 5½ years after E.W. turned 13.

¶ 76　　　　Even so, we agree with the State that the mother's estimate of E.W.'s age was not unbelievable as a matter of law. As defendant feels obliged to admit, "E.W.'s mother certainly knew her daughter well." A reviewing court must not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses. *People v. Jackson*, 2020 IL 124112, ¶ 64. E.W.'s mother testified that she could tell, by looking at the still photographs and by listening to the audio, that E.W. was eight or nine at the time. We are unconvinced that this claimed ability by E.W.'s mother was "contrary to the laws of nature or universal human experience." *People v. Johnson*, 2021 IL App (1st) 171885, ¶ 78. We defer, then, to the circuit court's finding that the mother was credible. Because the court had the right to believe her, we need not discuss the digital timestamps.

¶ 77　　　　　　　　　　　　　III. CONCLUSION

¶ 78　　　　For the foregoing reasons, we affirm the circuit court's judgment.

¶ 79        Affirmed.

*People v. Parlier*, **2023 IL App (4th) 220091**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 18-CF-92; the Hon. John Casey Costigan, Judge, presiding. |
| **Attorneys for Appellant:** | Gal Pissetzky, of Pissetzky Law, LLC, and Adam Bolotin, of Law Offices of Adam Bolotin, LLC, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |