NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241249-U

NO. 4-24-1249

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 19, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| KARRINGTON D. WALKER, | ) | No. 13CF296 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Zenoff and Lannerd concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) It is evident, from the face of the supplemental petition for postconviction relief filed by counsel, that amendments should have been made to two of its claims of ineffective assistance by trial counsel.

(2) Counsel provided reasonable assistance at the evidentiary hearing on defendant's postconviction claim that trial counsel rendered ineffective assistance by failing to call alibi witnesses.

¶ 2   After an evidentiary hearing, the circuit court of Peoria County denied a petition by defendant, Karrington D. Walker, for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). Defendant appeals on two grounds.

¶ 3   First, according to defendant, the record fails to show that, at the second stage of the postconviction proceeding (the motion for dismissal stage), counsel "made any amendments to" the *pro se* petition "that [were] necessary for an adequate presentation of [defendant's] contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017). We agree with this first argument. It is

evident, from the face of the record, that counsel should have amended two of the claims of ineffective assistance in the supplemental petition that she filed: (1) the claim that trial counsel inadequately cross-examined the victim, Maurice Sargent, and (2) the claim that trial counsel failed to investigate an alternative, exculpatory source for the gunshot residue (GSR) that the police had collected from defendant's left hand.

¶ 4 Second, defendant argues that, at the third stage of the postconviction proceeding (at the evidentiary hearing on the claim that survived the State's second-stage motion for dismissal), counsel failed to provide reasonable assistance. We disagree. We find that counsel provided reasonable assistance in her presentation of evidence on the surviving claim. She did the best that could reasonably be expected to prove an inherently weak claim.

¶ 5 Therefore, we affirm the circuit court's judgment in part and reverse it in part. We affirm the decision in the State's favor and against defendant on the witness claim, but we reverse the dismissal of the cross-examination and GSR claims—claims that clearly needed amendment—and we remand this cause for compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 6                                    I. BACKGROUND

¶ 7 On April 16, 2013, a grand jury issued an indictment against defendant. The indictment consisted of two counts. Count I charged him with attempted first degree murder in that, on April 5, 2013, he attempted to kill Sargent by discharging a firearm at him, inflicting upon him great bodily harm. See 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012). Count II alleged that, on the same date, defendant committed aggravated battery by discharging a firearm at Sargent and thereby injuring him. See *id.* § 12-3.05(e)(1).

¶ 8 On November 18, 2013, the first trial ended prematurely in a mistrial because the

jury was hung.

¶ 9        On January 28, 2014, the second jury trial began. The evidence at the second trial was essentially as follows.

¶ 10        On April 5, 2013, at about 5:15 p.m., in Peoria, Illinois, Sargent was sitting in the driver's seat of his car. He was at a stop sign and had either slowed down or stopped when he heard a loud noise and felt bullets piercing his thighs. He testified that he never saw the shooter approach and that he never got a look at the shooter; he just knew that the gunfire came from the right. When asked at trial whether he "[got] shot from the side or in the back," he answered, "Like on the passenger side, passenger side in the backseat part or something like that. I couldn't even tell you." After being shot, he drove away a short distance. He tried to drive to the hospital but crashed into a utility pole. Then he got out of his car and ran across the street. Someone called the police.

¶ 11        A Peoria police officer, Richard Brecklin, was dispatched to the scene of the accident. He found Sargent sitting on a chair in a parking lot. Sargent's pants were pulled down around his ankles, and there were gunshot wounds on his legs. He appeared to be in pain and was bleeding. Brecklin asked him what had happened. Defendant replied he had been near a barbershop, talking with a friend, when "another male came from the other side and fired several shots at him" (to quote Brecklin's testimony). The prosecutor asked Brecklin, "Did he indicate the name of the individual that had shot him?" Brecklin answered, "I believe he said Karrington."

¶ 12        An ambulance was called for Sargent, and Peoria Police Officer Jonathan Irving followed the ambulance to the hospital. In the emergency room, Irving saw that Sargent had sustained three gunshot wounds: one to the right buttock, one to the right thigh, and one to the

left thigh.

¶ 13 A Peoria detective, Keith McDaniel, also came to the hospital. He asked Sargent, who had been administered pain medication, if he could identify the shooter. At 6:38 p.m. on April 5, 2013, in the emergency room, Sargent signed an advisory form acknowledging that (1) in the photographic array that McDaniel would show him, the suspect might or might not be present, (2) Sargent was not required to make an identification, and (3) he should not assume that McDaniel knew which person was the suspect. After signing the advisory form, Sargent looked at a photographic array and made an identification. To quote McDaniel's testimony, Sargent "circled the picture and then he put 100 percent sure and he placed his name ***, Maurice Sargent, over the photo of the person who shot him." The photograph that Sargent circled and signed was of defendant. Sargent informed McDaniel that he knew defendant and that, before the shooting, he got into an altercation with defendant.

¶ 14 At trial, however, Sargent characterized the altercation as having been "really no big deal" and hardly of the intensity to result in violence. He also backpedaled on his positive identification of defendant. Because the shooter "came from behind", "toward the back where the gas tank would be at", Sargent testified he could not say with 100% certainty that defendant was the shooter. Sargent could not remember being shown any photographs at the hospital, but he agreed he most likely remembered more then than he remembered now. He explained that, "after [he] wrecked, [he] was dazed, like [he] got hit with a brick or something." He could remember only "little bits and pieces" of what happened after the wreck. He was unsure which window of his car the shots came through or whether the window was up or down.

¶ 15 According to the testimony of Timothy Wong, a Peoria police officer assigned to the crime scene unit, the shots came through the front passenger window of Sargent's car. Wong

took photographs of the scene of the accident, where Sargent's car had hit a pole. He also took photographs of Sargent's car. People's exhibit No. 7, Wong testified, was "taken from inside the car just showing that the windows [*sic*] was broken out and that's probably where the shots came from." The prosecutor asked Wong, "And that window is the passenger side of the vehicle?" He answered, "Yes. The front passenger window. Yes."

¶ 16        When defendant was arrested, he was unarmed. In their search of his residence pursuant to a search warrant, the police found no firearm. However, GSR was detected on a swabbing taken from the back of defendant's left hand. From the positive result of the GSR test, a forensic scientist, Scott Rochowicz, drew the following conclusion: "[E]ither [defendant] discharged a firearm, was in close proximity to a firearm when it was discharged[,] or contacted a [primer GSR] related item."

¶ 17        On January 29, 2014, the jury found defendant guilty on both counts of the indictment: attempted first degree murder and aggravated battery.

¶ 18        On March 6, 2014, the circuit court sentenced defendant to 35 years' imprisonment for attempted first degree murder (imposing no sentence on the count of aggravated battery).

¶ 19        Defendant took a direct appeal, in which he made only one argument: that the evidence was insufficient to prove he had the specific intent to kill Sargent. See *People v. Walker*, 2015 IL App (3d) 140217-U, ¶ 2. That argument was unsuccessful. The appellate court concluded that sufficient evidence had been adduced from which a rational trier of fact could find, beyond a reasonable doubt, that defendant had specifically intended to kill Sargent. See *id.* Therefore, the appellate court affirmed the circuit court's judgment. *Id.* ¶ 24.

¶ 20        On April 14, 2016, defendant filed, *pro se*, a petition for relief under the Act. At

the end of his petition, he signed a notarized oath that "the facts in this petition are true and correct in substance and in fact."

¶ 21 Defendant groups the claims of his *pro se* petition (or, more precisely, such of those claims that he discusses in this appeal) into three categories. All three categories raise theories of ineffective assistance of trial counsel.

¶ 22 Defendant calls the first category his "witness claim." According to this claim, defendant was with "either Katrina Walker or Jerleesha Ware" "around the time of the offense" (to quote the *pro se* petition). Defendant so informed his trial counsel, J. Thomas Sheets (the *pro se* petition continues), but Sheets never spoke with Katrina and Ware and never tried to contact them. Both of those alibi witnesses would have been "willing to meet with [Sheets] and testify on defendant's behalf." The *pro se* petition further criticizes Sheets for "fail[ing] to contact Barry Carpenter, who was said to have been on the scene of the crime by the victim" and would have testified that defendant was not at the scene. When filing his *pro se* petition, however, defendant provided no supporting affidavits by Katrina, Ware, and Carpenter. He explained in his *pro se* petition that his imprisonment and indigence prevented him from obtaining their affidavits.

¶ 23 Defendant calls the second category his "cross-examination claim." The *pro se* petition criticizes Sheets for failing to adequately cross-examine Sargent at trial. According to the *pro se* petition, if Sheets had "properly question[ed]" him, Sargent "would have informed the court [that] he knows who the person who shot him is." In support of his cross-examination claim, defendant attached to his *pro se* petition a statement purportedly signed by Sargent (and notarized—but without any oath language). In his statement, Sargent explains that, "in his state of adrenaline and shock," he uttered defendant's name merely because defendant "live[d] in the

area" of the shooting but that "it was not [defendant]" who shot him. Sargent continues in his statement, "I now know who shot me and would hate for someone to lose their life to prison for something he did not do." Neither the *pro se* petition, however, nor Sargent's statement divulges the name of the real shooter, how Sargent came to know that this unnamed person was the real shooter, or how Sheets knew or should have known that Sargent was aware of who the real shooter was.

¶ 24 Defendant calls the third category his "GSR claim." According to this claim in the *pro se* petition, Sheets rendered ineffective assistance by failing to "look into evidence" regarding the GSR on defendant's left hand, even though defendant had informed Sheets that he, defendant, "could prove where the [GSR] came from." The *pro se* petition does not reveal, however, where the GSR came from or how defendant could have proven the GSR was deposited on his hand in an event other than the shooting of Sargent.

¶ 25 On April 29, 2016, the circuit court docketed the *pro se* petition for further proceedings and appointed the public defender.

¶ 26 On May 29, 2020, after five continuances by the defense, Assistant Public Defender Maggi S. Wettstein filed a supplemental petition for postconviction relief. All the supplemental petition did was incorporate by reference defendant's *pro se* claims, without altering any of the claims, adding new claims, or attaching additional affidavits or supporting documentation.

¶ 27 Along with the supplemental petition, Wettstein filed a "Certificate Pursuant to Illinois Supreme Court Rule 651(c)" attesting as follows:

"1. I have consulted with Petitioner by mail and by phone to ascertain his contentions of deprivation of constitutional rights.

2. I have examined the records of the proceedings at the trial and the entire court file.

3. I have made any amendments to the petition filed *pro se* that are necessary for adequate preservation [*sic*] of petitioner's claims."

¶ 28 On September 15, 2020, the State moved that the circuit court dismiss the *pro se* and supplemental petitions for postconviction relief. The motion argued that, because the original and supplemental petitions lacked affidavits by the supposed alibi witnesses, the witness claim failed to establish a substantial deprivation of a constitutional right. The motion argued that the cross-examination claim lacked merit because, having elicited testimony from Sargent that he never saw the shooter and, hence, never saw defendant shoot him, Sheets had no reason to ask Sargent if he knew who the real shooter was. The motion argued that the GSR claim lacked merit because it was conclusory, failing to divulge what defendant's information about the GSR was and how Sheets could have used the information.

¶ 29 On February 22, 2021, Wettstein filed a response to the State's motion for dismissal. Attached to her response, as exhibit B, was an affidavit by defendant, in which he attested, "I informed my trial attorney, Tom Sheets, of my witnesses, Katrina Walker, Barry Carpenter, and Jerleesha Ware, but he refused to call upon them to testify on my [behalf]." Additionally, Wettstein attached to her response, as exhibit C, a letter from Katrina, in which Katrina recounted:

"[O]n the day in question me and [defendant] spent about 2 to 3 hours talking and smoking before he and his then girlfriend left to go and pick up her children and were arrested leaving the house. Had I been asked to, I would have told you this at trial but no one has ever contacted me."

¶ 30       On September 8, 2021, the circuit court granted the State's motion for dismissal as to the cross-examination claim and the GSR claim but denied the motion as to the witness claim.

¶ 31       On December 27, 2021, a private attorney, Karen Y. Ranos, entered her appearance as postconviction counsel, replacing Wettstein. After Ranos's entry of appearance, the third-stage hearing was continued eight times: sometimes on Ranos's motion, sometimes on the joint motion of the parties, and sometimes on the prosecutor's motion.

¶ 32       On June 7, 2024, the third-stage hearing on the witness claim began. Ranos called Katrina, who testified substantially as follows. Defendant was her cousin. On April 5, 2019, when Katrina was pregnant, she lived with her grandmother in Peoria.  Defendant lived there, too, occupying the basement of their grandmother's house. On the day of the shooting, Katrina, defendant, and his girlfriend, Ware, aka Leelee, were in the house together, smoking and talking. Ware received a message to go pick up her children, so she and defendant left her grandmother's house. It was still light outside when they left. As defendant and Ware were driving away, the police pulled them over and arrested them. Ranos asked Katrina:

         "Q. But he had been at the house with you for how long would you say?

         A. Mostly all day. I mean, probably all day."

Katrina testified that trial counsel never contacted her and that she never spoke with him.

¶ 33       Next, Ranos announced that she would call a private detective, George Leonard. The prosecutor objected because, having interviewed Leonard, he anticipated that Leonard would testify merely that locating Sargent had been difficult and that Leonard "could not really get any details from *** Sargent other than that [Sargent] said his affidavit was truthful." The prosecutor did not see the point in calling Leonard merely to "bolster" Sargent's affidavit by

repetition, without adding to it any "material information."

¶ 34　　Ranos responded that, because it was a postconviction proceeding, the rules of evidence were relaxed. Also, she explained, "I would like to question Mr. Leonard about the *** steps he [took] to locate Mr. Sargent. And he also has some information regarding the name Karrington Walker."

¶ 35　　The circuit court allowed Ranos to call Leonard. He testified he was an Illinois licensed detective and that he had been hired to locate Sargent. He ended up locating two Maurice Sargents: a father and son who shared that name. Leonard testified:

> "Yes, in June of 2023 I started to try to locate Mr. Sargent. I didn't have a date of birth or any initial information about him. I did find two Maurice Sargents. One was 49 years old. I think the other was 30 years old. And I found a 29 year old [*sic*] that lived in West Burlington, Iowa, that was the father. He got me in touch with the son, Maurice Sargent, who was 30."

(Evidently, instead of "a 29 year old," Leonard meant "a 49 year old." Otherwise, the father would have been a year younger than the son.) Also, in his investigation, Leonard learned that there were two Karrington Walkers, both of whom "had been located in Peoria County."

¶ 36　　Because Ranos's remaining witness, Barry Carpenter, had not yet arrived to testify at the third-stage hearing, the circuit court, with Ranos's consent, allowed the State to call its own witness out of order. The State called Sheets, who testified in essence as follows. He had no independent recollection of defendant or his case, and he had no notes regarding his representation of defendant. However, in his 20 years of experience as a prosecutor and defense attorney, he had handled over 100 jury trials, and if a criminal defendant he was representing had given him information about an alibi witness, especially in an attempted murder case, he would

have investigated the alibi. If defendant had given him the names of two alibi witnesses, he would have followed up with those witnesses.

¶ 37　　　　　On cross-examination, Ranos asked Sheets, "[I]n the course of your career you would have ensured you had pretrial discovery?" He answered, "[Y]es. "And that would include police reports, police interrogations?" Ranos asked. "Yes, counsel," he answered Ranos then asked him, "And so if a witness had been mentioned in those witness statements, police interrogations, so on and so forth, would you have tracked down those potential witnesses?" The prosecutor objected for two reasons: (1) the question implied a fact that had not yet been established, namely, that the police report named an eyewitness, and (2) the question was "somewhat out of the four corners of the petition," which claimed that Sheets had failed to investigate alibi witnesses of whom defendant had informed him, not that Sheets had failed to investigate a witness named in the police report. Ranos responded that Carpenter was named in the petition and that "[t]he only reason it's not being presented to the Court as *** an actual innocence claim is because Barry Carpenter's name is mentioned in police reports" and, hence, "both sides knew that this witness existed" and he was "not a new witness." The prosecutor objected that he did not believe that Carpenter was listed in the police report.

¶ 38　　　　　The circuit court stated that it understood the prosecutor's objection. Even so, the court decided to allow Ranos to ask Sheets the question, and afterwards, the court would "sort it out for [itself]." Ranos then asked Sheets, "[I]n the course of your career when you're reviewing pretrial discovery and you come across the name of someone who may have directly observed the crime, would you have investigated that potential witness?" Sheets answered that "[n]ot everybody whose name appears in a police report is of value" and that "it depends what that individual is relating to the police officers on the scene."

¶ 39 The evidentiary hearing then was recessed. On August 19, 2024, during the recess, Ranos filed a motion for a continuance. In her motion, Ranos explained that, after conferring with Leonard, she had "[come] to the realization that there may have been two men named Karrington Walker in the Peoria area on the date of the shooting." Leonard had found out that, from 2011 to 2024, a man named Karrington Terrelle Walker lived in the vicinity of Peoria and that this other Karrington Walker had a criminal record, including convictions of aggravated unlawful use of a weapon by a felon and domestic battery. Consequently, Ranos "believe[d] that there may be a claim of actual innocence based on mistaken identity which should be presented before this court." Because "the petition [was] still technically open," she "request[ed] a continuance to determine if this actual innocence claim can be supported by appropriate facts and witnesses."

¶ 40 Attached to the motion for a continuance was an affidavit by Leonard, in which he averred as follows:

> "On Wednesday, June 21, 2023, this Investigator received a phone call from Maurice Sargent. Mr. Sargent resided in West Burlington, Iowa and was responding to my efforts to speak with him. Mr. Sargent, who was 49 years old at the time. When I questioned him about Karrington Walker, he stated that Walker was his cousin. When I questioned [him] about the shooting, he replied that he [*sic*] son was the victim, and that I was obviously talking about the other Karrington Walker. Both Karrington Walkers resided in the Peoria Area."

¶ 41 On August 23, 2024, when the evidentiary hearing was reconvened, Carpenter was now present to testify, and Ranos told the circuit court she did not want to continue the evidentiary hearing after all. Nevertheless, she "was hoping that this Court would be willing to

let us finish the evidentiary hearing, but perhaps not close out the post conviction petition and allow me possibly leave to supplement the additional claim." The prosecutor objected that any additional claim was waived because of its non-inclusion in the petition. The court decided:

> "Well, just as a practical matter, I'm going to hear from Mr. Carpenter and then I'm going to review everything. Seems to me the thing to do would be to file whatever it is you're going to file. And then we can hear from the State on whether or not—what their position is and I'll try and sort it out."

¶ 42 Ranos then called Carpenter, who testified substantially as follows—repeatedly qualifying his testimony, however, with the remark, "It's been a long time ago." He "witnessed" a shooting (or, more precisely, he was in the vicinity of a shooting) one afternoon in April 2013. He "just walked up and heard some shooting and [saw] somebody start running, [a] dark skin dude running with dreads." The man was probably 6 feet or 5 feet, 10 inches tall and "had some weight on him." Carpenter saw no gun in the man's hand, nor did he see the man's face. The man, though, was not defendant. Carpenter saw no one else at the scene. He never approached the police with what he had seen. Rather, after seeing the man running, Carpenter merely continued on his way—he kept walking. The police had never questioned Carpenter about the incident. He did not know defendant well. Carpenter knew him only from having seen him as Carpenter was growing up. One of defendant's family members, with whom Carpenter was better acquainted, mentioned to Carpenter that defendant was locked up for the shooting. In "[p]robably around like 2015 or something like that," Carpenter reached out to defendant's family members, informing them that defendant was not the man he saw running after he heard the gunfire. The reason why Carpenter came forward with this information was that an injustice needed to be corrected: it was not right that defendant was locked up for something he did not

do.

¶ 43        On September 12, 2024, which was 20 days after the third-stage hearing concluded, the circuit court issued an order denying the petition for postconviction relief. The relevant paragraphs of the order read as follows:

"1. Cause heard on June 7, 2024 and August 23, 2024, upon 3rd stage hearing in this Supplemental Post Conviction Petition Relief filed on May 29, 2020. The issues were limited to alibi and alibi witnesses. Counsel and Defendant *** appear in person before the Court. This Court having heard the testimony of Tom Sheets and Barry Carpenter and having the opportunity to view credibility, personality and demeanor of the same, and after hearing closing arguments, this matter was taken [under] advisement. Now having reviewed the entirety of the evidence, file, pleadings, appellate history and arguments, this court does FIND:

2. The testimony of Barry Carpenter was relevent [*sic*] but [not] nearly enough to meet Defendant's burden at this stage in the proceeding. His recollection was foggy at best.

3. Atty Tom Sheets testified credibly; the testimony cannot overcome the overwhelming evidence against the Defendant.

4. Defendant has not shown by a preponderance of the evidence the legal standard necessary for relief, specifically 3rd stage proceedings were not of such conclusive character that would probably change the outcome of a retrial *i.e.* ultimate outcome would not be different.

5. Wherefore, the Defendant's Supplemental Post Conviction pleadings filed herein to date and the relief requested therein are denied. This is a final

order."

¶ 44       This appeal followed.

¶ 45                              II. ANALYSIS

¶ 46       A. Any Need to Amend the Witness Claim Is No Longer of Concern

¶ 47       Under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), the record must

contain a showing, which may be made by the certificate of counsel, that counsel "has made any

amendments to the petitions filed *pro se* that are necessary for an adequate presentation of

petitioner's contentions." As we have already signaled in the subheading above, we are

concerned only with the need to amend the cross-examination claim and the GSR claim. We pass

over the question of whether the witness claim should have been amended (even though, on

appeal, defendant raises that question, too).

¶ 48       Our reason for passing over that question is that the witness claim, deservedly or

not, advanced to the third stage of the postconviction proceeding, the evidentiary stage (see

*People v. Coons*, 2024 IL App (4th) 230552, ¶ 27). Rule 651(c) applies only to the second stage

(see *id.* ¶ 31), the stage at which the State may file a motion to dismiss the petition or an answer

to the petition (*id.* ¶ 27). The witness claim survived the State's motion for dismissal at the

second stage. As the Fourth District held in *Coons*, "[o]nce a petition advances to a third-stage

evidentiary hearing, Rule 651(c) no longer applies." *Id.* ¶ 31. By corollary, once the witness

claim advanced to the third-stage evidentiary hearing, Rule 651(c) ceased being relevant to that

claim. See *id.* Whether the witness claim should have been amended at the second stage is an

academic question, and we do not decide academic questions. *People v. Parlier*, 2023 IL App

(4th) 220091, ¶ 59.

¶ 49       B. The Cross-Examination Claim and GSR Claim Needed Amending

¶ 50          On the one hand, under Rule 651(c), the "record" must "contain a showing" that postconviction counsel "made any amendments to the petitions filed *pro se* that are necessary for an adequate *presentation* of petitioner's contentions"—a showing that may be made by a certificate but does not have to be made by a certificate, provided that the record otherwise makes the showing. (Emphasis added.) Ill. S. Ct. R. 651(c) (eff. July 1, 2017). On the other hand, Wettstein filed a certificate attesting that she had "made any amendments to the petition filed *pro se* that are necessary for adequate *preservation* of petitioner's claims." (Emphasis added.) Her certificate substituted the phrase "adequate preservation" for the phrase the supreme court uses in Rule 651(c), "adequate presentation" (*id.*).

¶ 51          Does the certificate, with that alternative wording, raise a presumption that counsel "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions?" *Id.* A certification by counsel that he or she performed the duties in Rule 651(c) raises a rebuttable presumption that counsel performed those duties, absent an "absent an affirmative showing in the record" that counsel failed to perform them. *People v. Urzua*, 2023 IL 127789, ¶ 54. Only if the record includes a certificate raising a rebuttable presumption of counsel's compliance with Rule 651(c) does the burden shift to defendant to prove, by an affirmative showing from the record, that counsel failed to substantially comply with Rule 651(c). See *People v. Addison*, 2023 IL 127119, ¶ 21.

¶ 52          To raise a presumption that counsel performed the duties in Rule 651(c), the certificate need not mirror the language of the rule. See *People v. Richardson*, 382 Ill. App. 3d 248, 257 (2008). Any alternative language in the certificate, however, must have substantially the same meaning as the language in the rule. See *People v. Bashaw*, 361 Ill. App. 3d 963, 969 (2005) ("[C]ounsel's certification that [the] defendant 'indicated that he wishes to rely on his

- 16 -

original postconviction petition' is not an appropriate substitute" for a certification that counsel "made 'any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions.' "). To raise a presumption that counsel "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions" (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)), the certificate must so state, either in those words or in words having essentially the same meaning.

¶ 53        Does "adequate preservation of petitioner's claims" have essentially the same meaning as "adequate presentation of petitioner's contentions" (*id.*)? In *People v. Thomas*, 2025 IL App (4th) 240895-U, ¶ 35, Wettstein filed a Rule 651(c) certificate that, like her certificate in the present case, substituted "adequate preservation" for "adequate presentation." On appeal, the defendant in *Thomas* challenged the facial sufficiency of the certificate. *Id.* ¶ 46. The appellate court concluded that the defendant's facial challenge to the certificate made "a distinction without a difference." *Id.* The appellate court reasoned as follows:

> "Substantial compliance extends to the Rule 651(c) certificate. [Citation.] A certificate that fails to exactly mirror the language of Rule 651(c) may still be found sufficient if it substantially complies with the rule. [Citation.] Counsel's statement that amendments were made to defendant's *pro se* petition to *preserve* defendant's claims was adequate to infer that counsel was attesting the supplemental petition adequately *presented* defendant's contentions. In fact, the supplemental petition incorporated by reference all the arguments defendant made in his prior postconviction petitions.
>
> The certificate counsel filed substantially complied with Rule 651(c), creating a rebuttable presumption that counsel provided defendant with the

- 17 -

reasonable assistance the law requires." (Emphases in original.) *Id.* ¶¶ 47-48.

¶ 54　　　Defendant maintains that this logic in *Thomas* is flawed. He argues that " '[p]reservation' cannot be fairly read as 'presentation' here, for 'the Act depends on postconviction counsel to [adequately] present potentially meritorious claims' to the trial court—not merely to preserve those claims for appellate consideration after they have already been 'squandered' through inadequate presentation below" (quoting *People v. Agee*, 2023 IL 128413, ¶ 44). In other words, as defendant explains, a claim can be preserved for review only to be found, on review, to have been inadequately presented below, such as by the omission of an element or the failure to supply corroborating evidence. The problem, then, defendant points out, would not be a procedural forfeiture of the claim (or nonpreservation of the claim), but, rather, the problem would be a lack of substantive merit because of the inadequate presentation of the claim in the circuit court—and, indeed, the finding of nonmeritoriousness on appeal would presuppose the preservation of the claim for the making of that substantive finding.

¶ 55　　　Defendant makes a reasonable argument here. We are reluctant, however, to upend a previous decision by the appellate court unless resolution of the present appeal requires that we do so. We can take a conservative approach, assuming the validity of *Thomas*'s logic and nevertheless concluding that amendments to the GSR claim and the cross-examination claim needed to be made. In other words, if *Thomas* is left undisturbed and the facial validity of the Rule 651(c) certificate is therefore assumed, defendant has nevertheless rebutted the presumption that Wettstein made all necessary amendments. See *Addison*, 2023 IL 127119, ¶ 21.

¶ 56　　　　　　　　　　　　1. *The GSR Claim*

¶ 57　　　In the *pro se* petition, the GSR claim was that Sheets had failed to "look into evidence" regarding the GSR, even though defendant had told Sheets that he, defendant, "could

prove where the [GSR] came from." In the supplemental petition that she drafted and signed, Wettstein incorporated this claim by reference, without addition or alteration. She thereby certified that the adopted and unamended claim was "well grounded in fact and *** warranted by existing law" (Ill. S. Ct. R. 137 (eff. Jan. 1, 2018)). See *People v. Hunt*, 2022 IL App (4th) 210001, ¶ 26 ("[G]eneral civil practice rules and procedures apply to postconviction proceedings to the extent they do not conflict with the Act.").

¶ 58   It is clear, though, from the face of the supplemental petition (which is to say, the face of the adopted *pro se* petition), that this claim is not in "proper legal form." *People v. Profit*, 2012 IL App (1st) 101307, ¶ 18. "At the second stage, the defendant must make a *substantial* showing of a deprivation of constitutional rights[,] or the petition is dismissed." (Emphasis added.) *People v. Jackson*, 2025 IL App (1st) 240754-U, ¶ 13. The vague assertion that defendant informed Sheets of an alternative, exculpatory source of the GSR is an unsubstantial showing absent an explanation of what that alternative source was and how it could have been proven. Leaving the reader hanging in this manner—tantalizing the reader only to withhold the most important information—is not an "adequate presentation" of the GSR claim. Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 59   Because Wettstein certified, by her signature on the supplemental petition, that the GSR claim was "well grounded in fact" (Ill. S. Ct. R. 137 (eff. Jan. 1, 2018)), she evidently had a factual basis for this claim. However, she failed to spell out the factual basis, as it was her job to do. Her draftsmanship of the GSR claim fails the test of reasonableness. See *People v. Perkins*, 229 Ill. 2d 34, 42 (2007) ("The Act provides for a 'reasonable' level of assistance," and "[t]o assure the reasonable assistance required by the Act, Supreme Court Rule 651(c) imposes specific duties on postconviction counsel," including "mak[ing] any amendments to the *pro se*

petition necessary for an adequate presentation of the petitioner's contentions."). Wettstein chose to adopt the GSR claim and to append her signature to it, and therefore, she should have made the best of it. No one reading the GSR claim could seriously characterize it as "adequate[ly] present[ed]." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 60                                  2. *The Cross-Examination Claim*

¶ 61            If, when cross-examining Sargent at the second trial, Sheets was aware, or had been put on notice, that Sargent knew the shooter was *X* rather than defendant, then perhaps Sheets could be faulted for failing to elicit testimony from Sargent that the shooter was *X*. That Sargent positively knew the shooter was someone else would tend to exculpate defendant (over and above Sargent's trial testimony that he never saw the shooter when he was being shot). Other than defendant's conclusory and enigmatic assertion, however, there appears to be no evidence that Sheets had such awareness or that he had been put on notice. In fact, by stating, "I *now* know who shot me," Sargent implies that his knowledge of the real shooter's identity was only recently acquired. (Emphasis added.)

¶ 62            Therefore, as defendant correctly argues, the cross-examination claim is essentially a claim of actual innocence mistakenly dressed up as a claim of ineffective assistance. The claim wears the wrong uniform, so to speak, and thus is inadequately presented. See *id.* We express no opinion on the merits or legal sufficiency of a claim of actual innocence. We merely agree with defendant that ineffective assistance is patently the wrong legal theory for this claim and that a theory of actual innocence is a better fit. See *Perkins*, 229 Ill. 2d at 43-44 ("We have repeatedly held that the purpose of Rule 651(c) is to ensure that counsel shapes the petitioner's claims into proper legal form and presents those claims to the court.").

¶ 63                                  C. The Inapplicability of *Res Judicata*

¶ 64        The State contends that, because the claims that defendant raises in his postconviction petition "were available to defendant during his direct appeal and could have been raised" therein "but *** were not," the doctrine of *res judicata* bars the claims. More precisely, the supreme court has held, "[I]ssues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered waived." *People v. Williams*, 209 Ill. 2d 227, 233 (2004).

¶ 65        Defendant counters with the holding in *People v. Veach*, 2017 IL 120649, ¶ 47: "Procedural default does not *** preclude a defendant from raising an issue on collateral review that depended upon facts not found in the record."

¶ 66        The holding in *Veach* applies to the present case. All of defendant's postconviction claims required substantiation by affidavits or other evidence (see 725 ILCS /122-2 (West 2020)), and, thus, depended on facts that were outside the record on direct appeal. Therefore, the omission of those claims in the direct appeal does not result in a procedural default. See *Veach*, 2017 IL 120649, ¶ 47.

¶ 67        D. The Reasonableness of Counsel's Assistance at the Third Stage

¶ 68        Defendant complains that, at the third-stage evidentiary hearing, Ranos provided less than reasonable assistance. See *Coons*, 2024 IL App (4th) 230552, ¶ 41 ("Once defendant's postconviction petition advanced to the third stage, 'general reasonableness' was the relevant standard for assessing postconviction counsel's performance."). He criticizes her performance for three reasons.

¶ 69        First, while presenting evidence, at the third-stage hearing, that Katrina and Carpenter would have testified favorably for the defense if they had been called at trial, Ranos presented no evidence that Sheets should have been aware of Katrina and Carpenter and of the

favorable testimony they could have given. Defendant quotes *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 133: " 'Defense counsel has a duty to investigate possible defenses and present exculpatory evidence[ ] but only those defenses and evidence of which counsel is or reasonably should be aware.' "

¶ 70        In an affidavit attached as exhibit B to the supplemental petition, however, defendant averred that he had informed Sheets of Katrina and Carpenter. Apparently, in making its third-stage decision, the circuit court considered that affidavit. The court stated it had "reviewed the entirety of the evidence, file, [and] pleadings." Exhibit B of the supplemental petition was part of the "file" and the "pleadings." Therefore, in reaching its decision, the court reviewed exhibit B, and Ranos's failure to offer exhibit B into evidence was harmless.

¶ 71        A postconviction proceeding "is civil in nature" (*People v. Johnson*, 191 Ill. 2d 257, 270 (2000)), and in civil cases, "[h]armless error occurs when, despite the presence of an error, it appears no harm has been done" (internal quotation marks omitted) (*Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 157) or "it appears that [the] error did not affect the outcome below" (internal quotation marks omitted) (*U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 458 (2009)). Ranos's failure to introduce exhibit B into evidence caused no harm to the defense: the circuit court considered exhibit B anyway. The court considered evidence that defendant had notified Sheets of Katrina and Carpenter.

¶ 72        Second, defendant criticizes Ranos because she "repeatedly raised the specter of an additional claim [citation], and even introduced evidence to support an additional claim during the third-stage proceedings [citations], without ever following through on an attempt to add an additional claim to the petition." Ranos's performance was unreasonable in this respect, however, only if reasonableness required that she move for permission to add a claim to the

petition. Defendant does not explain how the mere existence of two Karrington Walkers in Peoria could have supported a claim of actual innocence. Ranos contemplated making a claim of actual innocence, tried to keep her options open, and ultimately decided against moving for permission to add such a claim to the petition. We do not see how she thereby rendered unreasonable assistance.

¶ 73 Third, because the circuit court, in its final decision, failed to mention Katrina and erroneously applied the standard for a second-stage claim of actual innocence (see *People v. Sanders*, 2016 IL 118123, ¶ 46) instead of a third-stage claim of ineffective assistance of counsel (see *People v. Marcus*, 2023 IL App (2d) 220096, ¶ 61), defendant argues that Ranos should have filed "a post-decision motion" pointing out those mistakes.

¶ 74 We are unconvinced. A defense counsel must know when to press the case further and when to stop. It was reasonable of Ranos to desist from arguing the witness claim further, considering that this already questionable claim had become even more questionable after Carpenter's testimony.

¶ 75 The witness claim was questionable to begin with because Katrina was defendant's cousin. Even if defendant had informed Sheets that Katrina was willing to offer alibi testimony, Sheets could have reasonably decided that her testimony would be useless because the jury would perceive her as biased in defendant's favor. Under case law, the mere kinship between Katrina and defendant would have made Sheets's rejection of Katrina an unassailable strategic decision. See *People v. Deloney*, 341 Ill. App. 3d 621, 635 (2003) ("We find that the record further reveals that defendant's decision not to call the alibi witnesses was strategic. *** [W]e note that the alibi witnesses were defendant's cousins and, as such, their credibility may have carried little weight."); *People v. Dean*, 226 Ill. App. 3d 465, 468 (1992) ("All three of the

potential alibi witnesses may have been related to codefendant \*\*\*, and thus their credibility may have carried little weight. Defense counsel's decision to not offer them as witnesses amounts to trial strategy.").

¶ 76  The witness claim became even more questionable when Carpenter testified that he first approached defendant's family members in "[p]robably around like 2015 or something like that"—the year after Sheets ceased representing defendant (the jury returned its guilty verdicts in January 2014). Because it had become clear, by the end of the third-stage evidentiary hearing, that the witness claim was objectively meritless, Ranos could have reasonably decided there would be little point in quibbling over the error and omission in the circuit court's analysis that defendant raises on appeal. See *People v. Stoecker*, 2020 IL 124807, ¶ 45 ("[C]ounsel's failure to pursue a meritless claim cannot constitute deficient representation warranting remand.").

¶ 77                                  III. CONCLUSION

¶ 78  For the reasons stated, we affirm the circuit court's judgment in part and reverse it in part. We affirm the decision in the State's favor and against defendant on the witness claim, but we reverse the dismissal of the cross-examination claim and the GSR claim and remand this case for compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 79  Affirmed in part and reversed in part; cause remanded with directions.